In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 06-3827 & 06-3828

JEREMY KUNZ,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

RICHARD DEFELICE,

*Defendant-Appellant/*
*Cross-Appellee,*

and

CITY OF CHICAGO, *et al.*,

*Defendants/Cross-Appellees.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1753—**James B. Zagel**, *Judge*.

_____

ARGUED NOVEMBER 28, 2007—DECIDED AUGUST 14, 2008

_____

Before EASTERBROOK, *Chief Judge,* and FLAUM and WOOD,
*Circuit Judges.*

WOOD, *Circuit Judge.* On March 22, 1999, Jeremy Kunz
spent the afternoon and evening in a bar watching

March Madness and consuming a few Guinnesses. As the night wore on, he asked a fellow he knew from the bar, Erik, if he could borrow Erik's SUV for a short time. Erik handed over the keys to his vehicle, and Kunz left on his errand. The events relating to the rest of the evening gave rise to a low-speed car chase, a brutal interrogation, and a lawsuit against the City of Chicago and certain police officers. Kunz prevailed in that litigation, winning jury verdicts against Officer DeFelice for $10,000 in compensatory damages and $250,000 (later reduced to $90,000) in punitive damages, as well as a verdict against the City for another $15,000 in compensatory damages. The City and DeFelice appeal from those judgments, and Kunz cross-appeals from the district court's grant of summary judgment in the defendants' favor on several other counts.

In the end, we find that the evidentiary arguments on which DeFelice relies fail to show any abuse of discretion by the district court, much less the prejudice that would be necessary to upset the jury's verdict. With respect to the cross-appeal, we conclude that Kunz's additional theories were properly dismissed. We therefore affirm the district court's judgment in its entirety.

# I

After Kunz left on his errand—which turned out to be the delivery of some drugs—he grazed a parked car and kept driving. His actions prompted a 911 call from a witness; Officer DeFelice and his partner responded. Despite the flashing lights on the police car, Kunz kept driving, with the police in pursuit. DeFelice discovered, after running the SUV's plates, that it had been reported stolen. When Kunz finally stopped the car, he got out and

tried to flee on foot. Throughout this time, he was trying to toss the packets of drugs away from himself. The chase ended after Kunz tried scaling a chain-link fence. Cornered at the top, he was ordered back to the ground and cuffed.

As he was being handcuffed, multiple police officers kicked Kunz, eventually causing a sharp pain later diagnosed as a broken rib. The police then dragged the injured and restrained Kunz to their squad car and took him back to the station, where they placed him in a room on a stool, still cuffed and facing DeFelice. DeFelice repeatedly punched Kunz in the face hard enough to make him pass out several times. Finally, Kunz falsely confessed that he knew that the car he was driving was stolen. Another officer, who had watched the entire exchange, typed out the confession. Kunz was then photographed and taken to the lock-up. He complained of injuries but was not taken until the next afternoon to a hospital, where he was given a non-prescription painkiller. A visit to an emergency room the day after that resulted in a prescription for Motrin.

As a result of this incident, Kunz was charged with possession of a stolen motor vehicle, aggravated flight, and leaving the scene of an accident. Four days after his arrest, he was returned to custody for violating a bail bond on an older retail theft charge; he chose to exonerate his bond and remain in custody so that the money could be returned to his mother. While he was in jail awaiting trial on the stolen vehicle charge, he and a high-school age co-defendant were charged with possession of a controlled substance based on an unrelated incident.

Distressed by the aftermath of Kunz's arrest, Kunz's mother filed a complaint on his behalf with Chicago's

Office of Professional Standards (OPS) on April 13, 1999, and OPS began to look into the matter. Even though OPS inquiries ordinarily take 30 days to complete, this one dragged on. Kunz requested the file in October 1999 in order to defend against the stolen motor vehicle charge and was told in November that the investigation was still active. OPS never did turn over the whole file, despite numerous requests and subpoenas.

On June 19, 2000, as the state court's patience with the slow discovery was wearing thin, the state's attorney elected to forgo the charge of possession of a stolen motor vehicle in favor of the charge for possession of a controlled substance. The reason given for the change in strategy was the need to expedite trial for the younger co-defendant, but at the hearing the prosecutor mentioned that the "[OPS] investigation" was "reaching [a] dead end . . . ." Kunz was convicted on the controlled substances charge and was sentenced on November 15, 2000. At the sentencing, Kunz's past convictions were introduced as aggravating factors, as was the possession of a stolen motor vehicle charge (describing the facts from the police report plus Kunz's confession). Kunz was sentenced to time served, and the State dismissed the stolen motor vehicle charge *nolle prosequi*.

Kunz was freed on November 20, 2000. Some time later, he filed a lawsuit under 42 U.S.C. § 1983 for, among other things, excessive use of force and failure to give medical treatment, as well as a claim for malicious prosecution under Illinois law. During the pretrial stage of the proceeding, the district court granted summary judgment in favor of defendant Michael Goldston and it dismissed Kunz's malicious prosecution claim. On August 5, 2005, just before trial was to begin, Kunz dismissed

without prejudice all remaining defendants except the City and DeFelice. (It is now much too late to revive those claims, and so these dismissals are now, as a practical matter, with prejudice.) At that time, Kunz also mentioned that he was seeking damages to compensate for the time he spent in detention. With respect to the latter point, the court ruled that Kunz could not introduce this evidence unless and until the jury ruled in his favor on liability.

After a four-day trial, the jury returned a verdict on August 11 finding that one or more City police officers and DeFelice used excessive force against Kunz and that City officers failed to provide him with medical attention. As we have already mentioned, it found that DeFelice was liable for $10,000 in compensatory damages and $250,000 in punitive damages, and the City was liable for $15,000 (since it had stipulated that it would pay any damages on behalf of the unnamed defendants in the suit). At that point, the record becomes murky. It is apparent, however, that Kunz never asked the district court to permit him to introduce evidence on the additional damages claim he had raised just before trial. Instead, on August 22, he moved for entry of judgment against DeFelice and the City. On August 22, the court responded with a minute order saying only "MOTION by Plaintiff Jeremy Kunz for entry of judgment . . . is granted. No notice"; the docket indicates that this order was entered on August 29, 2005. Eventually, on September 16, 2005, the court entered a formal "Judgment in a Civil Case"; interestingly, that judgment says that it "is entered in favor of plaintiff Jeremy Kunz and against defendant City of Chicago and Richard Defelice [*sic*] in the amount of $25,000 for compensatory damages and $250,000

in punitive damages against defendant Richard Defelice."
(It is unclear why the court added together the two com-
pensatory damages verdicts, but as this has no effect on the
appeal, we do not comment further on it.) As we ex-
plain below, even this order left parts of the case hanging,
but all claims of all parties were eventually wrapped up
before the notices of appeal were filed.

In the meantime, on September 1, 2005, DeFelice moved
under FED. R. CIV. P. 59 to reduce the punitive damages
award. This motion was filed just three business days
after the court's minute order granting Kunz's motion
for entry of judgment was entered, even though it came
before the Rule 58 judgment. Before the court ruled on
DeFelice's motion, Kunz filed a motion on November 4,
2005, seeking to revive his claim for damages arising from
his detention; he argued in the motion that the Fourth
Amendment supported such damages, and he added an
argument based on the Fifth Amendment in his reply brief.
The district court rejected Kunz's motion in an order of
June 22, 2006. It ruled on DeFelice's *remittitur* request on
August 30, 2006, and reduced the punitive damages
award to $90,000. It did not, however, enter a new
Rule 58 judgment. Both DeFelice and Kunz filed their
notices of appeal and cross-appeal on October 19, 2006.

## II

We begin with Officer DeFelice's appeal. Before
turning to the merits, we must decide whether his notice of
appeal was filed by the required date. In general, parties
other than the United States have 30 days from the date
when the judgment or order is entered to file an appeal.
FED. R. APP. P. 4(a)(1)(A). A motion under FED. R. CIV. P. 59

to alter or amend a judgment has the effect of post-poning this deadline until the entry of an order disposing of that motion. FED. R. APP. P. 4(a)(4)(A)(iv). In this case, the court disposed of DeFelice's Rule 59 motion on August 30, and DeFelice did not file his notice of appeal until October 19, substantially beyond the 30-day period allowed. We must therefore see whether any rule effectively extended the time for his appeal.

The answer depends on whether the district court's order granting his Rule 59 motion in part is one that is subject to the "separate document" requirement of Rule 58(a). That rule says "[e]very judgment and amended judgment must be set out in a separate document, but a separate document is not required for an order dis-posing of a motion . . . (4) . . . to alter or amend the judg-ment, under Rule 59 . . . ." If the separate-document requirement applies, then both Rule 58(c)(2) and FED. R. APP. P. 4(a)(7)(A)(ii) provide that the time of entry is considered to be the earlier of the date when the judg-ment is set out in the separate document or 150 days from the entry of the order or judgment in the civil docket. If the separate-document rule does not apply, then the time of entry is simply whenever the judgment is entered in the civil docket. For DeFelice, if the time is measured from the latter date, then his notice of appeal is too late. If, however, the separate-document rule applies, he is entitled to take advantage of the 150-day period provided by Rule 58(c)(2)(B) and FED. R. APP. P. 4(a)(7)(A)(ii)(second bullet point).

The language of Rule 58 and its appellate counterpart does not contain any exceptions or qualifications for orders disposing of motions under Rule 59. Logically, therefore, one might think that the Rule exempts from the

separate-document requirement all such motions, not just a subset of them. That is not, however, the way that this court read the rule in *Employers Insurance of Wausau v. Titan International, Inc.*, 400 F.3d 486 (7th Cir. 2005). We were concerned that the great majority of amended judgments would come about as a result of motions made under the various rules identified in Rule 58(a). Appellate Rule 4(a)(4)(B)(ii) reinforces that assumption, insofar as it seems to contemplate an amended final judgment from which an appeal may be taken, after the district court rules on any of the motions listed in Rule 4(a)(4)(A).

If orders disposing of this set of post-judgment motions, including motions under Rule 59, were not subject to the separate-document rule, there is a risk that we would effectively have read the separate-document require-ment out of the rule for almost all amended judgments. Moreover, Rule 58(a) had good reason to require a separate document for at least some amended judgments: the document clarifies what the ultimate result is, benefiting both the parties (for purposes of enforcement and clarity of legal obligation) and the judicial system (for providing a clear time period for taking an appeal). In order to reach that desirable outcome, however, some stretching was necessary, as we explained:

> The only way to reconcile the requirement that an amended judgment be set forth in a separate document with the exception to that requirement for an order disposing of a Rule 59(e) motion is by reading "dispos-ing of a motion" as "denying a motion." The reading is supported, though muddily, by the Committee Note to the 2002 Amendment to Rule 58. The note states that "if disposition of the [Rule 59(e)] motion

results in an amended judgment [ . . . ] the amended judgment must be set forth on a separate document[.]" [ . . . ] Granting a motion is one way of "disposing" of it, but when a motion to amend a judgment is granted, the result is an amended judgment, so the rule becomes incoherent if "disposing" is read literally, for then the order granting the motion both is, and is not, an order required to be set forth in a separate document. Nonsensical, or as here logically impossible, interpretations of statutes, rules, and contracts are unacceptable . . . . So we are driven to interpret "disposing" as "denying," not "granting or denying[.]"

*Titan*, 400 F.3d at 489 (citations omitted). As far as we can tell, no court of appeals has disapproved *Titan*'s result. The result is a sensible one, putting to one side the tension it creates with the language of the rule, and *Titan* is a relatively recent decision from this court. We therefore adhere to its ruling and conclude that the separate-document rule *did* apply to the district court's August 30, 2006, order of *remittitur*. Because no such document was ever prepared, the time of entry of that order is deemed to be 150 days after the order was docketed. DeFelice's appeal fell comfortably within that period, and we thus have appellate jurisdiction.

DeFelice challenges both the jury's finding of liability and the amount of the punitive damages award, even as reduced. His primary complaint about the liability ruling relies on several evidentiary rulings that the district court made during the course of the trial. In order to review this kind of complaint, it is essential that counsel draw to this court's attention the rulings and explanations the district court gave for its actions. That is why FED. R.

APP. P. 30(a)(1)(B) & (C) require the appellant to file an
appendix containing "the relevant portions of the plead-
ings, charge, findings, or opinion" and "the judgment,
order, or decision in question." See also 7TH CIR. R. 30(a).
Unfortunately, none of the rulings that DeFelice chal-
lenges was attached to his brief. Although Kunz supplied
several of the missing rulings (albeit not always with
correct citations), at least one of them was not. Worse, there
are places where the citations have not supported the
points for which they were furnished. This violates FED. R.
APP. P. 30(a)(1)(B) & (C) and 7TH CIR. R. 30(a); it also
means that the certification required by 7TH CIR. R. 39(d)
was incorrect. As we pointed out in *United States v.
Patridge,* 507 F.3d 1092 (7th Cir. 2007), "[t]his court regu-
larly fines lawyers who violate Circuit Rule 30 yet falsely
certify compliance under Circuit Rule 30(d). *E.g.*, *United
States v. White*, 472 F.3d 458, 465-66 (7th Cir. 2006); *United
States v. Evans*, 131 F.3d 1192 (7th Cir. 1997); *In re Galvan*,
92 F.3d 582 (7th Cir. 1996)." 507 F.3d at 1096. We return to
this topic at the end of the opinion. For now, we observe
only that the appellate record included enough to permit
us to carry forward with our review of the case.

A. Exclusion of Evidence of Conviction

The first ruling DeFelice asks us to examine is the district
court's decision to exclude one of Kunz's convictions
from evidence. The State wanted to introduce a 2005
conviction for retail theft into evidence, even though it
had already succeeded in putting many other convic-
tions before the jury. DeFelice contends that the retail
theft conviction is especially probative because it hap-
pened very close to trial and thus supposedly illustrated

a consistent pattern of criminality. This is propensity by another name, however (DeFelice calls it "full flavor"), and propensity is a forbidden basis for admitting evidence. See *United States v. Wright*, 901 F.2d 68, 70 (7th Cir. 1990); see also FED. R. EVID. 404(b). Given the prior convictions for residential burglary already in evidence, the district court was entitled to conclude that the retail theft evidence was cumulative or inadmissible propensity evidence.

DeFelice also argues that the conviction should have been admitted either as a crime involving falsehood, see FED. R. EVID. 609(a)(2), or for impeachment. Looking first at impeachment, here again the district court enjoys broad discretion. DeFelice cites *Green v. Bock Laundry Machine Co.*, 490 U.S. 504 (1989), and *Campbell v. Greer*, 831 F.2d 700 (7th Cir. 1987), for the proposition that evidence of past convictions submitted under FED. R. EVID. 609(a)(1) is not subject to the considerations of prejudice set forth in FED. R. EVID. 403. He does not mention that Rule 609 was amended after *Green* and *Campbell* to incorporate expressly the balancing of probative value against prejudice that Rule 403 embodies. The district court was thus fully entitled to take Rule 403 into account. Whether, in the final analysis, the court's reasoning was predicated on cumulativeness or propensity, we find no indication that the court abused its discretion or that its ruling prejudiced DeFelice.

DeFelice also argues that the district court should have admitted Kunz's prior conviction as a crime involving falsehood under Rule 609(a)(2), which does not incorporate Rule 403. Although DeFelice is correct that Illinois considers theft to be a crime of dishonesty for the purposes of its version of Rule 609(a)(2), *People v. Spates*, 395 N.E.2d 563, 567-69 (Ill. 1979), he is incorrect to assume

that this designation is binding on this court—it is not. See *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987). This circuit generally does not count retail theft as a crime of dishonesty. See *United States v. Amaechi*, 991 F.2d 374, 379 (7th Cir. 1993). If DeFelice had presented some independent reason to override *Amaechi* and construe Kunz's conviction as a crime involving dishonesty, we could have evaluated that argument. See *United States v. Rodriguez-Andrade*, 62 F.3d 948, 952 (7th Cir. 1995). He did not, however, and we thus cannot conclude that the district court abused its discretion by failing to follow Rule 609(a)(2).

What DeFelice would really like to do is to portray Kunz as a witness who is predisposed against police officers and who has a propensity to misbehave. But FED. R. EVID. 404 generally forbids the use of past acts, even of criminality, to prove a criminal, dishonest character in a civil case. None of the exceptions to that rule applies here. The jury had ample evidence before it that alerted it to Kunz's prior encounters with the law. Whether the court excluded the evidence because it raised an inference of propensity forbidden by Rule 404 or because it was cumulative and thus excludable under Rule 403, we see no abuse of that discretion.

### B.  Exclusion of Expert Witness

DeFelice also argues that the district court erred by excluding his key expert witness, James O'Donnell. Under the framework established by FED. R. EVID. 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), this court reviews *de novo* whether the district court understood the

legal requirements of Rule 702, and then reviews decisions to admit or exclude expert testimony for abuse of discretion. *General Electric Co. v. Joiner,* 522 U.S. 136, 142-43 (1997); *United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005).

Kunz asserts that DeFelice failed to preserve this point properly in the district court, but we are satisfied that DeFelice's offer of proof was enough to alert the court to the central questions: what was O'Donnell going to testify about, what methods did he use, and on what information did he base his conclusions? The first *Daubert* question on the merits is whether the court handled its gatekeeping role properly. The court must decide whether the proffered expert testimony is "based upon sufficient facts or data" and is "the product of reliable principles and methods." FED. R. EVID. 702(1) & (2). Here, the district court found O'Donnell's testimony unreliable because it was not based on a sound methodology. DeFelice wanted O'Donnell to testify about Kunz's ability to recall and narrate events on the night in question, given the fact that Kunz had admitted to using a small amount of heroin earlier in the evening. The district court noted that O'Donnell knew neither a baseline against which to judge whether Kunz was impaired, nor Kunz's habituation level (which might influence the impairing effects of the drug). Indeed, O'Donnell was a singularly unimpressive witness. His credentials were weak, at best: his degree is called a Pharm.D.; he earned it after one year of classes, only one of which was in pharmacology. Despite the title, his Pharm.D. is not actually in pharmacology, and O'Donnell admitted elsewhere to advertising falsely that it was. Before he became a full-time consulting expert witness, O'Donnell's

experience was as a nutritionist. In addition, O'Donnell practically admitted on cross-examination that he had not referred to any scientific literature in formulating his opinion in this case except for one article, proffered by Kunz, which contradicted O'Donnell's conclusion.

The district court found O'Donnell's testimony unhelpful, commenting that "[v]irtually everything [O'Donnell] said, with respect to this, was anticipated by me." The court then compared O'Donnell to other expert witnesses who "give you a long description of why 20 or 30 percent of eyewitnesses make errors" but who "really have nothing to offer as to why this particular eyewitness in the case didn't make an error." O'Donnell hoped to shed light on heroin users as a group, but he had nothing useful to say about Kunz's condition at the critical time. In addition, Kunz pointed out that even if O'Donnell's testimony were taken at face value, the impairing effects of the heroin should have worn off at least 90 minutes before the car chase occurred. According to a defense expert, there might not have been any effect at any time. That expert opined that habituation levels are crucial in a case like this: far from being impaired, a habituated heroin user can use a "maintenance dose" to avoid impairment and maintain normal function. Under the circumstances, the district court did not abuse its discretion in excluding O'Donnell's testimony. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-54 (1999).

### C. Restriction on Cross-Examination about Drug Use

DeFelice questions the district court's ruling barring cross-examination about drug use. The chief difficulty he faces on appeal is that the district court never made this

ruling. As DeFelice acknowledges in his reply brief, the district court forbade only use of the word "heroin," because at the time of the arrest, the officers did not know the nature of the drug or Kunz's usage and because mention of heroin would be more prejudicial than helpful. DeFelice apparently intended to cross-examine Kunz about his drug use in order to establish the foundation for O'Donnell's testimony about the impairing effects of heroin use.

This court has explained when evidence of a witness's drug use may be introduced:

> Evidence that a witness has used illegal drugs may be probative of the witness' possible inability to recollect and relate . . . . This evidence may be admitted where the memory or mental capacity of a witness is legitimately at issue. . . . At the same time, however, there is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony. . . . A court must, therefore, be chary in admitting such evidence when it is offered for the sole purpose of making a general character attack.

*United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987) (quotations and citations omitted). The only link between Kunz's drug use on the night in question and his recollection would have been through O'Donnell's testimony. Absent that link, additional evidence of Kunz's drug use (other than that to which he had already admitted) would only have served to raise the inference that drug users tend to lie. That inference is impermissible. *United States v. Robinson*, 956 F.2d 1388, 1397-98 (7th Cir. 1992) ("The appellants, in sum, insist that witnesses who have previously used narcotics are more likely to tell lies. This

is exactly the type of character attack that *Cameron* and *Jarrett* [*v. United States*, 822 F.2d 1438 (7th Cir. 1987)] forbid."). The district court did not abuse its discretion when it established limitations on the evidence about Kunz's drug use.

### D.   Exclusion of Witnesses as Discovery Sanction

DeFelice takes issue with the district court's decision to bar the testimony of five witnesses as a discovery sanction under FED. R. CIV. P. 37. The district court took this step because it found that DeFelice failed to disclose the names properly. As Kunz points out, the names were buried within a multitude of other names, such as a police district roll call, with nothing to signal that they had anything useful to add. The district court found that it would place an excessive burden on the plaintiff to require him to sift through every single name turned over in discovery. In fact, DeFelice is caught in a trap here. If the testimony of these witnesses was relevant and useful, then his failure to disclose was prejudicial, and the district court properly exercised its discretion to exclude the testimony as a Rule 37 sanction. On the other hand, the error could only be harmless if the testimony was irrelevant or not useful—which would be grounds for excluding it anyway. Either way DeFelice wants to have it, the district court did not abuse its discretion in excluding the testimony.

### E.   Punitive Damages; Other Defendants

DeFelice's final two arguments are intertwined: he asserts that the district court should not have permitted

Kunz to dismiss all of the defendants other than DeFelice on the eve of trial. Their absence at trial prejudiced him, he says, primarily because it led the jury to impose the full weight of the punitive damages on him alone. That award, he continues, even at the $90,000 level, is disproportionate to the compensatory damages.

Voluntary dismissal pursuant to FED. R. CIV. P. 41(a)(2) is allowed at the district court's discretion. *Tyco Laboratories, Inc. v. Koppers, Co.,* 627 F.2d 54, 56 (7th Cir. 1980). A district court abuses its discretion only if the defendant shows that she will suffer "plain legal prejudice." We have identified four factors that throw light on whether this kind of prejudice would arise: "[t]he defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant." *Pace v. Southern Express Co.*, 409 F.2d 331, 334 (7th Cir. 1969).

DeFelice does not come close to showing reversible error here. The assertion that his defense was hampered by creating too many empty chairs at the defense table seems backward: far from preventing him from "deflecting" liability onto others, as he phrases it, it permitted him to point at those empty chairs and question how much of the harm he was responsible for. Unlike co-defendants, empty chairs do not talk back. DeFelice questioned Kunz about the dismissals at trial, and so the jury was well aware that DeFelice was not the only officer involved. Finally, DeFelice did not object to the motion at the time, and so he has forfeited the point.

DeFelice also argues that he was saddled with disproportionate punitive damages (initially $250,000, then after

*remittitur* $90,000) because he ended up as the sole de-fendant. When no constitutional issue about the size of a punitive damages award has been raised, we review only for abuse of discretion. *Cooper Industries v. Leatherman Tool Group*, 532 U.S. 424, 433 (2001). If, however, we must decide whether an award transgresses constitu-tional limits, our review is *de novo. Id.* at 436. DeFelice cites constitutional decisions in his brief, including *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996), and *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003), but he also cites one case from this circuit where a conventional claim of excessiveness was raised, and reviewed deferentially, *Abernathy v. Superior Hard-woods, Inc.*, 704 F.2d 963, 971 (7th Cir. 1983). Despite *Cooper*'s guidance, he does not distinguish between the two kinds of arguments. The Supreme Court's recent decision in *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605 (2008), underscores the importance of keeping these theories straight. In *Exxon,* the Court held that as a matter of federal common law, a punitive damages award in an admiralty case may not exceed the compensatory award (that is, a 1:1 ratio is the upper limit for this class of cases). 128 S.Ct. at 2633. The Court stressed both the particular features of maritime law, as exemplified by the oil spill caused by the *Exxon Valdez*, and the fact that it was "acting here in the position of a common law court of last review." *Id.* at 2629.

Kunz's case was brought under 42 U.S.C. § 1983. Al-though this statute, like many, requires a certain amount of elaboration, we do not sit, as the *Exxon* Court did, as a "common law court of last review." Instead, we must respect the limitations Congress built into the statute. In the context of establishing the proper limitations period

for various federal actions when the statute is silent, the Supreme Court has reminded us that "[i]nevitably our resolution of cases or controversies requires us to close interstices in federal law from time to time, but when it is necessary for us to borrow a statute of limitations for a federal cause of action, we borrow no more than necessary." *West v. Conrail*, 481 U.S. 35, 39 (1987). Looking particularly at § 1983, the Court has also held that "[t]here can be no doubt that claims brought pursuant to § 1983 sound in tort." *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999); *id.* at 727 (Scalia, J., concurring). There is thus good reason for us to look for guidance in the standards for excessiveness of punitive damages that courts have established in tort cases, when we evaluate this verdict.

DeFelice, however, has not presented any argument for the proposition that § 1983 imposes a stricter limitation on awards of punitive damages than the Constitution would permit in a state tort case. We therefore have no reason to consider that question. Instead, as he has implicitly requested, we look only at the question whether the eventual verdict of $90,000 in punitive damages exceeds the outer limits established in the Supreme Court's constitutional cases. Our evaluation is guided by three guideposts: the reprehensibility of the action in question, the ratio between the compensatory and punitive damages, and the parallel remedies available. See *Gore*, 517 U.S. at 575.

Of these guideposts, "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* Evaluating reprehensibility involves inquiry into whether the injury was physical, whether

it evinced a reckless disregard for the health of the
target, whether the target had a financial vulnerability,
and whether the injury was clearly intentional. See *State
Farm*, 538 U.S. at 419. DeFelice's brief slid quickly over
this factor. Kunz's injury was clearly physical, he was
shackled and defenseless while he was being punched
and thus vulnerable to the injury inflicted, and DeFelice's
violent actions were intentional. This court takes police
brutality very seriously as grounds for punitive damages.
See, *e.g.*, *Cooper v. Casey*, 97 F.3d 914, 919 (7th Cir. 1996).
The need to deter such behavior is plain: police brutality
is a longstanding problem with which many cities are
still coming to grips. The reprehensibility of DeFelice's
conduct in his position of public trust justifies a substan-
tial punitive damages award.

   The second guidepost we consult is the ratio between the
compensatory and punitive damages awards. As *Exxon*
reiterated, there is no "simple mathematical formula" that
courts must follow. See 128 S.Ct. at 2626; *Gore*, 517 U.S. at
580-82. Instead, the *Exxon* Court acknowledged that
"heavier punitive awards have been thought to be justifi-
able when wrongdoing is hard to detect" or "when the
value of injury and the corresponding compensatory
award are small." 128 S.Ct. at 2622. In making the latter
point, the Court relied on *Gore*, which recognized that
"low awards of compensatory damages may properly
support a higher ratio than high compensatory awards,
if, for example, a particularly egregious act has resulted
in only a small amount of economic damages." 517 U.S.
at 582. DeFelice does not offer a clear response to this
point. The jury's award of $10,000 in compensatory dam-
ages against DeFelice was low for a beating of this kind,
and there is some reason to think that the "punitive" award

was disguised compensation for pain and suffering. A total of $100,000 for Kunz's injuries does not seem excessive. Moreover, even accepting the characterization of the $90,000 damages award as punitive, the ratio to compensatory damages is still in the single-digits—9:1—nowhere near the 500:1 ratio overturned in *Gore*. Particularly in light of DeFelice's poorly developed arguments on this point, we see no reversible error in the ratio between the compensatory and the punitive damages.

The final guidepost involves examining the parallel remedies available to Kunz. DeFelice argues that under Illinois law a conviction for battery or aggravated battery would have resulted in fines of $2,500 or $25,000, respectively. See 730 ILCS 5/5-9-1(a)(1) & (2). While this is true, he neglects to point out that an aggravated battery conviction, a felony, might also bring from two to five years of prison time. 730 ILCS 5/5-8-1(a)(6). In *Gore* the Supreme Court recognized that fines alone might not tell the whole story about proportionality when imprisonment is also on the table. See *Gore*, 517 U.S. at 583-84. In this case, the possibility of damages under 42 U.S.C. § 1983 was also lingering in the background. In short, we cannot simply look in isolation at the fines authorized under the pertinent Illinois statutes. We note as well that nothing in this record suggests that DeFelice has already been punished. The City's brief says only that he is "no longer a Chicago police officer," citing to a place in the record where DeFelice testifies that he is retired. The broader picture therefore shows that the punitive damages award ordered by the court is not so disproportionate that we must vacate it.

**III**

We now turn to Kunz's cross-appeal against the City of Chicago. He appeals the district court's decision to enter summary judgment in the City's favor on his constitutional and state malicious prosecution claims. The City, in addition to defending its judgment, asserts that this court has no jurisdiction over the cross-appeal because it was untimely filed. We conclude, however, that we have appellate jurisdiction. After explaining why, we turn to the merits.

A.  Jurisdiction

The City questions the timing of Kunz's damages complaint. It argues that Kunz did not raise this claim until after the district court entered final judgment in the case, and thus that this can at most be a motion under FED. R. CIV. P. 60(b). If that were correct, then his motion would be untimely: the court entered its judgment on September 16, 2005; the motion was made on November 4, 2005, and then it was denied on June 22, 2006. A motion under Rule 60(b) has a 30-day time limit for filing an appeal. See FED. R. APP. P. 4(a)(1)(A) (setting time limit at 30 days from the entry of the order appealed from); FED. R. APP. P. 4(a)(7)(A)(i) (starting clock on date of filing if order does not require a separate document to be filed); FED. R. CIV. P. 58(a)(1)(E) (order under Rule 60 does not require a separate document). On this account, Kunz's notice of appeal—filed October 19, 2006—comes too late, ousting this court of jurisdiction.

But a look at the record as a whole reveals that the district court used the "final judgment" form prematurely, even by its own lights. The district court had expressly

bifurcated Kunz's claim for damages. When it addressed the merits of the issue in its June 22, 2006 opinion, it noted that it had given permission to Kunz to raise the issue later on if he won at the main § 1983 trial. In a minute order entered on October 6, 2005, just a few weeks after the September 16 form was docketed, the court recognized that there was an "additional damages motion to come." Frustratingly, the district court did not purport to resolve all of the issues before it in the June 22, 2006 opinion, nor did it give a "no just reason for delay" certification for appeal of a partial summary judgment under Rule 54(b). All that we can see is an internal docket entry stating "case terminated," although it is not clear that this was even entered by the judge. With all of the other evidence we have, we agree with Kunz that the June 22, 2006 opinion was not a final judgment with respect to all claims against all parties. Thus, it would be improper to characterize his later motion as one made under Rule 60.

As best as we can tell (and it should not be this hard), the true final judgment in this case did not come until the resolution of DeFelice's *remittitur* motion on August 30, 2006. Like DeFelice's own notice of appeal, Kunz's October 19, 2006 notice of appeal is therefore timely under the 150-day limit of FED. R. APP. P. 4(a)(7)(A)(ii), and this court has jurisdiction over Kunz's cross-appeal.

## B.   Unlawful Detention

Kunz would like to assert a damages claim for the extra year he spent in jail, but his theory has shifted through the case. This claim was split off from the rest of

the trial in August 2005, raised again on November 4, 2005, and then denied on June 22, 2006. As of November 2005, it was framed as a claim for damages for the use of excessive force in violation of the Fourth Amendment. Kunz urged that the coercive force DeFelice used proximately caused his extended detention and ensuing damages. Later, in March 2006, Kunz recast the claim as one under the Fifth Amendment, in reaction to this court's holding in *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006).

The district court ruled that Kunz had failed to state a claim under either the Fourth or the Fifth Amendment; it expressed no opinion on the merits of a possible claim under the Fourteenth Amendment's substantive due process jurisprudence. The Fourth Amendment claim was found foreclosed under *Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006) ("We reject the idea of a stand-alone 'false confession' claim based on the Fourth Amendment, rather than the Fifth Amendment or the due process clauses."), affirmed on other grounds under the name *Wallace v. Kato*, 127 S.Ct. 1091 (2007). Kunz does not appeal this part of the ruling, but he does appeal the district court's rejection of his Fifth Amendment theory.

The Fifth Amendment argument was not properly preserved before the district court. Kunz's initial brief addressed only a claim under the Fourth Amendment; the Fifth Amendment theory was not articulated until the reply brief on this question. While all that is required is notice pleading, see *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the district court effectively considered this motion in a summary judgment posture. Kunz thus had to articulate a legal theory under which he was entitled to relief. See FED. R. CIV. P. 56(c). Although the

district court briefly mentioned the Fifth Amendment, its opinion shows that the theory was not fully developed before it (certainly not in the detail with which it was presented to this court). Especially on a question that would require the application of a novel legal theory to a new set of facts—as would be the case if *Sornberger* were to be applied here—the district court must have the first opportunity to rule with the benefit of full briefing and consideration. Failure adequately to present an issue to the district court waives the issue on appeal. *Belom v. Nat'l Futures Ass'n*, 284 F.3d 795, 799 (7th Cir. 2002). We therefore affirm the district court's judgment on this issue on the ground that it was not properly preserved in the district court.

## C.   Malicious Prosecution

Finally, the district court granted summary judgment to the City on Kunz's malicious prosecution claim. In order to prove malicious prosecution, Kunz must show "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such pro-ceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. . . . The absence of any one of these elements bars a plaintiff from pursuing the claim." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (citations omitted). The district judge found that the *nolle prosequi* entered in Kunz's case was not sufficiently indica-tive of innocence to satisfy the second *Swick* element and consequently did not reach any of the other elements. We express no view on the second element, because we

find that Kunz cannot satisfy the third one: there was sufficient probable cause to arrest and detain him.

The Illinois statute in question, 625 ILCS 5/4-103(a)(1), makes it a crime to possess a stolen car knowing it to be stolen. Kunz argues that there was insufficient indication of *scienter* to give probable cause for a charge under this provision: the police could not have thought that Kunz knew the SUV to be stolen. Nevertheless, in the very provision in question the statute says that "it may be inferred . . . that a person exercising exclusive unexplained possession over a stolen or converted vehicle . . . has knowledge that such vehicle . . . is stolen or converted." *Id.* Kunz's behavior easily exhibited the requisite control to demonstrate *scienter*. Illinois courts have relied on this constructive *scienter* provision. See *People v. Gentry*, 549 N.E.2d 609, 612 (Ill. App. Ct. 1989). This statute has been applied even when there are no outward signs of theft on the vehicle itself (such as a stripped steering column or punched locks) and when the keys were found in the car, *People v. Wallace*, 772 N.E.2d 785, 790-91, 797 (Ill. App. Ct. 2002), both of which were true in this case as well. The facts as they were known to the police at the time of the incident gave rise to an inference of probable cause under Illinois law. Because probable cause existed for the charge against Kunz, the prosecution cannot have been malicious under Illinois law.

## IV

In summary, we hold that Officer DeFelice has failed to show any abuse of discretion in the district court's various evidentiary rulings, and certainly not one affecting his substantial rights. He has also offered no

reason why we should set aside the amended award of punitive damages. Similarly, Kunz has failed to demonstrate why the district court erred in its rulings on his Fifth Amendment theory or his malicious prosecution claim. We therefore AFFIRM the judgment of the district court.

With respect to the violation of 7TH CIR. R. 30(d) we discussed above, we hereby issue an order to Joseph V. Roddy and Stacey McGlynn Atkins, the attorneys for DeFelice who signed the brief, to show cause why they should not be fined or otherwise disciplined for this violation. Their response is due within 10 days of the date of this opinion.