[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14743
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 26, 2012
JOHN LEY
CLERK

D.C. Docket No. 2:11-cr-00076-AKK-HGD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ORLANDO BARNES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 26, 2012)

Before HULL, JORDAN and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Orlando Barnes[1] appeals his convictions for armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). After review, we affirm.

## I. TRIAL EVIDENCE

Because Barnes raises evidentiary issues on appeal, we first review the relevant trial evidence.

### A. The Bank Robbery

On June 2, 2010, two men robbed a bank in Pleasant Grove, Alabama. The first robber to enter the bank, wielded a gun, and wore a white shirt, a white cap and a thick, strange-looking beard. The first robber jumped over the counter top and took money from the teller stations. Then, a second robber entered the bank and said, "We have a bailer, We have a bailer." At that point, the robbers left and drove away in a silver vehicle.

### B. Officer Cutcher's Chase

---

[1]We refer to the Defendant as Orlando Barnes, his name as it appears in the indictment, the judgment of conviction and other court documents. We note, however, that the Defendant's name is actually Orlanda Barnes, and that the trial court and witnesses referred to him interchangeably as "Orlando" and "Orlanda."

Officer Matthew Cutcher testified that police dispatch notified him that the bank robbery suspects, two black males in a silver car, were in the vicinity of a subdivision. As Officer Cutcher proceeded into the subdivision, he saw two suspects drive toward him at a high speed. Officer Cutcher turned his car to block the suspect vehicle, which drove on the grass and got away.

As the suspect vehicle passed Officer Cutcher's patrol car, Officer Cutcher saw two people inside, a driver and a passenger. Based on the subsequent chase and arrest recounted below, Officer Cutcher identified Defendant Barnes the as passenger. The chase and arrest occurred in this fashion.

As Officer Cutcher pursued the suspect vehicle, he learned that a witness reported that the bank robbers had worn fake beards. He also saw the occupants of the suspect vehicle throw two black, fluffy objects from the windows. When the suspect vehicle failed to stop at a stop sign, it collided with another vehicle, ran through a chain link fence and hit a house. Officer Cutcher exited his patrol car, and he saw the suspects run from the vehicle.

Officer Cutcher chased the passenger and another officer pursued the driver (who threw a white cap to the ground as he ran away). Officer Cutcher was about forty-five feet away from the passenger and could see that he was tall, with a medium build and very short hair. The passenger wore tan hiking boots,

extremely dark jeans and a white, long-sleeved, collared dress shirt. When the passenger rounded the corner of the house, Officer Cutcher lost sight of him for about two seconds. When Officer Cutcher caught sight of the passenger again, he was about forty feet away.

Officer Cutcher followed the passenger across the back yard and over a fence and toward a railroad bed. When the passenger climbed over the steep railroad embankment, Officer Cutcher lost sight of the passenger again, this time for about nine seconds.

As Officer Cutcher ran in the direction the passenger had disappeared, he found a white, long-sleeved shirt lying in the grass near an abandoned house. Officer Cutcher looked up and saw Defendant Barnes sixty feet away. Barnes was standing on a landing to some stairs. The stairs led to a garage apartment behind the abandoned house. Defendant Barnes was wearing the same boots and jeans, was the same height and had the same hair cut as the passenger Officer Cutcher had just been pursuing, except that Defendant Barnes was wearing a plain white t-shirt.

As Officer Cutcher approached, Defendant Barnes looked surprised and appeared winded. Barnes had his palms open toward Officer Cutcher, and Officer Cutcher noticed "black, sticky glue stuff" that was "flaky and balled on the end of

4

[the Defendant's] fingertips." Officer Cutcher asked Barnes who he was, and Barnes replied, "What's going on?" Officer Cutcher responded, "A bank robbery." Barnes turned toward the garage and said, "I live here." Officer Cutcher stepped within five or six feet of Barnes and noticed that Barnes had "little black flecks and balls all in his beard stubble."

Officer Cutcher stepped back and told Barnes to put his hands on a nearby vehicle. Barnes began to run away. Officer Cutcher followed and yelled for him to stop. After about one hundred feet, Barnes stopped and put his hands up. Officer Cutcher pulled Barnes to the ground and, with the help of another officer who was nearby, placed Barnes in handcuffs. As he did this, Officer Cutcher saw that both sides of Barnes's face, from his ear to his goatee, were covered in a flaky, sticky substance "like latex paint." Officer Cutcher went into the garage apartment to look for the other suspect and found that it smelled of mildew and had no electricity, water or furniture.

After arresting Barnes, Officer Cutcher took photographs and collected evidence from the chase, including, among other things: (1) hairs from the white hat the driver threw on the ground outside the suspect vehicle; (2) two guns and stacks of currency from a pillow case found inside the suspect vehicle; (3) pieces of the black latex-like substance and hairs and fibers found on the white, long-

5

sleeved shirt; (4) the black latex-like substance containing hairs found in the passenger seat of the suspect vehicle; and (5) the black latex-like substance containing hair found in the back seat of the patrol car that transported Barnes to jail. Officer Cutcher also recovered one of the fake beards by the side of the road.

## C.     Motions in Limine

Defendant Barnes filed three pre-trial motions in limine seeking to prevent the government from offering expert opinion testimony regarding boot prints, hair and adhesives. Barnes argued that the government's experts could not testify to a reasonable degree of scientific certainty and thus their testimony did not meet the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

At trial, the district court denied all three motions in limine, finding that the expert testimony in question satisfied the Daubert standard because the experts would testify to valid scientific or technical knowledge and the testimony would assist the trier of fact with an issue in the case. The district court also noted that Barnes could raise his key points through cross-examination and contradictory evidence. The district court granted Barnes a continuing objection to the expert testimony.

## D.     Boot Print Expert

Brian McVicker, an FBI laboratory examiner, analyzes footwear impression evidence. McVicker testified that to conduct footwear impression analysis, he visually compares known footwear to either a digital image, a "tape lift," or a cast of the footwear impression found at the crime scene. McVicker explained that he first looks for similarities in the pattern on the bottom of the footwear or "outsole." If there are similarities, McVicker compares the physical size characteristics. To do this, McVicker makes a test impression from the known shoe, or "test impression," by applying fingerprint powder to the bottom of the known shoe and walking across an adhesive sheet, creating a black footwear impression on a transparent background. McVicker then superimposes the test print over the tape lift impression from the crime scene to compare the size, shape and design of the two prints. McVicker testified that this type of footwear impression analysis is "generally accepted throughout the world."

McVicker conducted this footwear impression analysis between (1) "tape lift" impressions found on the counter top at the bank and (2) "test impressions" of the boots Defendant Barnes was wearing when arrested. The government first sought to introduce the test impressions McVicker created using Barnes's boots. Barnes objected, arguing that "everybody's gait's different and . . . weight, size, all that stuff is different." The district court initially sustained the objection.

McVicker then testified about the tape lift impressions from the bank. Based on his analysis of the tape lifts, McVicker found that the crime scene impressions had: (1) angular elements around the perimeter and circular elements in the center that corresponded to the bottom of Barnes's left boot; (2) a pattern of circular elements in the center and chevron elements around the perimeter and a V-shaped element at the top that was similar to the toe of Barnes's boots; (3) a distinctive crescent-shaped wear characteristic that corresponded in size, design and orientation to the upper left portion of Barnes's left boot. McVicker also found that the physical size characteristics of one crime scene impression corresponded to Barnes's boot, from the heel to the toe, including the spatial arrangement of the pattern on the sole.

McVicker could not say "definitively, 100 percent" that Barnes's boots made the impressions in the tape lifts. McVicker explained that "[d]ue to the movement when the impressions were made, portions of the outsole did not impress" and he "couldn't see the characteristics that [he] needed to make an identification." Thus, McVicker opined, that one of the tape lifts "corresponded to . . . the left boot . . . in outsole design, physical size," and that the crescent-shaped wear characteristic corresponded "and therefore could have made this particular impression," but that the other tape lifts only "shared similar design features with

8

the left or the right boot."

Outside the jury's presence, the district court revisited the admission of McVicker's test impressions made by walking in Barnes's boots. Barnes renewed his objection, arguing that the conditions (weight, gait and movement) under which the test impressions and the crime scene impressions were made did not necessarily match. McVicker clarified that a colleague, who wore a size 13 shoe, made the impressions under his supervision. The district court now admitted the test impressions, finding that Barnes could cross-examine McVicker as to the conditions.

McVicker then testified about how he created the test impressions, explaining that he powdered Barnes's boots with fingerprint powder and had a co-worker who wore a size 13 shoe put the boots on and walk across a sheet of clear adhesive paper to make an impression. McVicker then made a transparency of the impressions so he could compare physical size characteristics by superimposing the transparency over the crime scene impressions. McVicker stated that the comparison method using a transparency was the standard procedure for analyzing footwear impressions and that he had used that procedure in every footwear investigation he had conducted. McVicker concluded, based on such a comparison, that the physical size characteristics of the crime scene and test

impressions corresponded and that Barnes's boots "could have made" the crime scene impressions. Although the tape lifts "shared similar design features," with the boots, the quality of the tape lift impressions was insufficient to make a more conclusive opinion.

On cross-examination, McVicker testified, <u>inter alia</u>, that the boots collected from Barnes were made by Timberland, a popular brand. McVicker agreed that everyone has a different gait and that the co-worker who wore the boot during the test did not jump on a counter. McVicker explained that he used the words "correspond" and "similar," in their ordinary sense, not as scientific terms. McVicker said that "correspond" means that "two things are similar," not that they are exact or identical. McVicker agreed that his opinion was only that the boots "could have . . . made" the crime scene impressions, not that they did make them and reiterated that it was not possible to determine definitively that Barnes's Timberland boots created the impressions found at the crime scene. On redirect examination, McVicker agreed that he was also unable to eliminate the Timberland boots with respect to any of the crime scene impressions.

E.    **Hair and Fiber Expert**

Sandra Koch, an FBI trace evidence examiner, performed the hair and fiber analysis in Barnes's case. Koch testified that she conducts hair and fiber

examinations in special processing rooms where she separates the hair and fiber from other evidence. She then mounts the material onto slides for examination under a comparison microscope, which permits comparison of two samples side by side at a very high magnification.

Using this microscope, Koch can identify whether the evidence is fiber or hair and whether it is human or animal hair. For human hair, which has three layers, Koch can examine its microscopic characteristics and determine whether the source person has European, African, Asian or Native American ancestry, what part of the body the hair came from, whether the hair was artificially treated and whether there are any roots.

Koch advised, however, that hair is "not a means of positive identification to one individual to the exclusion of all others because" the range of characteristics from different people can overlap. Thus, using microscopic comparison, Koch can: (1) conclude that the characteristics are "consistent" such that a "person can be included as a possible source"; (2) reach a "nil conclusion" because there are both similarities and differences; or (3) conclude that "a hair is microscopically dissimilar and not consistent with having come from a known sample."

In Barnes's case, Koch examined sample hairs from a "fake beard" and

found that the beard was made of real human head hair with Negroid characteristics, but without roots. Koch also examined hair found in debris from the back seat of a patrol car that transported Barnes. Using a comparison microscope, Koch compared the layers (the cuticle, cortex and medulla), the pigment distribution and the patterning within the two hair samples. Koch observed that the hairs from the back seat of the patrol car were Negroid head hairs that exhibited the same microscopic characteristics as the hairs from the fake beard. Thus, Koch concluded that the "two samples were consistent with having come from the same person or that the person whose head hair made up that fake beard could have been the source of the hairs found in the debris collected from the patrol car."

On cross-examination, Koch reiterated that hairs were not a means of positive identification. Koch admitted that it was also a possibility that the two samples came from different sources. When asked if she could quantify how many people the patrol car sample could have come from, Koch stated that she could not, as follows:

> You really can't get quantifiable numbers with hair examinations. It really is an examination where you need a known sample. So I will leave open the possibility that it could have come from somebody else because the range of characteristics of different individuals can overlap. However, I'd have to see another known sample to make a more definitive statement.

When defense counsel pressed Koch to say whether the patrol car sample could have come from ten other people or ten thousand other people, Koch said, "I would probably not say ten thousand," but when asked if it could have come from five thousand people, Koch responded, "I cannot give you a number." Koch explained that she could not say how many other people in the world have hair with the same microscopic characteristics because "there is no actual reliable way to database hair analysis."

On redirect, Koch acknowledged that hair analysis allowed her to draw only one of three conclusions: (1) the hair was "consistent with a known sample or that it exhibits the same microscopic characteristics" such that "the person or object that those hairs came from could be included as a possible source of those hairs"; (2) the "hair exhibits similarities and differences, and I cannot make a conclusion because of those differences"; or (3) the hair is "microscopically dissimilar and is not consistent or that person or that object could not have been a possible source of those hairs." In Barnes's case, Koch's conclusion was that "the hairs that came from the debris from the back seat of the patrol car and the fake beard item . . . exhibit the same microscopic characteristics" and that the fake beard "could be included as a possible source of the items from the patrol car."

F.    **Adhesive Expert**

13

Maureen Bradley, an FBI chemist, analyzes paints, polymers and adhesive materials. Bradley analyzed the black latex-like substance found (1) in the right, front seat of the suspect vehicle, (2) in the pocket of the white, long-sleeved shirt and (3) in the back seat of the patrol car that transported Barnes. Bradley compared these substances to the black rubber material found on the fake beard and found that they all had the same physical appearance, that is, they all were black and elastomeric (or rubbery). Based on her visual examination, Bradley concluded that the black latex-like substances found in the suspect vehicle, the shirt pocket and the patrol car were "physically consistent to . . . the black material on the fake beard."

Bradley also analyzed the chemical composition of the samples using two different instrumental methods and found that "they were comparable to one another in chemical composition." However, Bradley could not say definitively that all the samples came from the same source because the material was polyisoprene, or rubber cement, which was a common adhesive formulation, and there were "not techniques that would necessarily differentiate different sources of polyisoprene."

On cross-examination, Bradley admitted that polyisoprene was a common adhesive formulation that could be used for a number of different purposes.

14

Bradley could not say how many different people used the adhesive in Alabama in the last two or three years.

**G.    Convictions and Sentence**

At the close of the evidence, Barnes moved for a judgment of acquittal, arguing, <u>inter alia</u>, that the government failed to prove that Barnes was the man who robbed the bank.  The district court denied the motion, finding that the evidence was sufficient to support a guilty verdict.

The jury found Barnes guilty on all three counts.  The district court sentenced Barnes to a total sentence of 159 months' imprisonment.  Barnes filed this appeal.

## II.  DISCUSSION

**A.    Officer Cutcher's Lay Opinion Testimony**

Defendant Barnes argues that the district court improperly admitted Officer Cutcher's testimony that Barnes was the passenger in the suspect vehicle.  Barnes contends that this testimony was not based on Officer Cutcher's personal knowledge as required by Federal Rules of Evidence 602 and 701.[2]

Under Rule 602, "[a] witness may testify to a matter only if evidence is

---

[2]We review a district court's decision to admit evidence for abuse of discretion.  <u>United States v. Smith</u>, 459 F.3d 1276, 1295 (11th Cir. 2006).

15

introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. A witness's lay opinion is admissible if, inter alia, it is "rationally based on the witness's perception." Fed. R. Evid. 701. This limitation on lay opinion testimony is "'the familiar requirement of first-hand knowledge or observation.'" United States v. Jayyousi, 657 F.3d 1085, 1102 (11th Cir. 2011) (quoting the advisory committee's note to Rule 701).

The record belies Barnes's claim that Officer Cutcher's identification of Barnes was not based on personal knowledge. Specifically, Officer Cutcher testified that, during the vehicle chase, he learned that the bank robbers had worn fake beards. He also saw the suspects throw black, fluffy objects from their vehicle. After the crash, Officer Cutcher saw the passenger run from the suspect vehicle, and he pursued the passenger on foot, staying within about forty feet of him. Indeed, Officer Cutcher was able to observe the passenger's physical features and clothing and described them in detail.

Although Officer Cutcher very briefly lost sight of the passenger as he climbed a steep embankment, Officer Cutcher saw nine seconds later (1) a white, long-sleeved shirt (like the one worn by the passenger) lying on the ground, and (2) standing sixty feet away, Defendant Barnes, who looked like the passenger in

every respect except that he was not wearing the white, long-sleeved dress shirt. Defendant Barnes seemed surprised and winded. Defendant Barnes also had a black, sticky substance on his face and hands, which was consistent with having recently removed a fake beard.

Contrary to Barnes's argument, nothing in the record suggests that Officer Cutcher's opinion was based on subsequent investigation. Rather, it is clear from Officer Cutcher's testimony that he believed Barnes was the passenger of the suspect vehicle at the time he arrested Barnes and that Officer Cutcher's belief was based on his own observations during the chase.

In short, Officer Cutcher testified from personal knowledge about his pursuit of the passenger in the suspect vehicle, as required by Rule 602. And, Officer Cutcher's opinion that Defendant Barnes was that passenger was rationally based on his perceptions during the chase, as required by Rule 701. Therefore, the district court did not abuse its discretion in admitting Officer Cutcher's testimony that Defendant Barnes was the passenger in the suspect vehicle whom he chased.

## B.    Forensic Expert Testimony

Defendant Barnes argues that the testimony of the three forensic experts—McVicker (the boot print expert), Koch (the hair and fiber expert) and Bradley (the adhesive expert)—should have been excluded as unreliable under

Daubert.[3]

> Rule 702 of the Federal Rules of Evidence provides that:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Barnes does not challenge the qualification of the three forensic experts or argue that their testimony did not assist the trier of fact. Barnes argues only that their opinions were unreliable. See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (explaining that the proponent of expert testimony has the burden to show qualification, reliability and helpfulness to the jury).

In Daubert, the Supreme Court provided a non-exclusive list of factors for district courts to consider in determining whether expert testimony is sufficiently reliable. Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796-97. These factors

_____

[3]We review for abuse of discretion a district court's decision regarding the admissibility of expert testimony and the reliability of an expert opinion. United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).

include: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Frazier, 387 F.3d at 1262; see also United States v. Brown, 415 F.3d 1257, 1267 (11th Cir. 2005). These factors also apply to assess the reliability of the expert's opinion based on experience or training rather than a rigorous scientific methodology. Frazier, 387 F.3d at 1262. The inquiry "is a flexible one" and "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Brown, 415 F.3d at 1267-68 (quotation marks omitted). Thus, not all factors "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of the proffered expert opinion." Frazier, 387 F.3d at 1262.

First, Defendant Barnes asserts that McVicker's testimony about the boot print evidence was not based on reliable principles and methods. Specifically, Defendant Barnes contends that "conditions must be identical to produce reliable results," and, thus, a test print created by a person of "unknown height, weight, and gait" cannot be reliably compared to an impression made by another person with a different height, weight, and gait.

19

Barnes offers no authority or evidence to support his proposition that footwear impression analysis is reliable only if a person of the same height, weight and gait is used to make the comparison print. Moreover, McVicker testified that the methods he used were the standard procedures for footprint analysis generally accepted throughout the world.

Barnes also argues that all three expert opinions should have been excluded as unreliable because they "r[an] afoul of the scientific requirement of at least some degree of quantification." Barnes relies on United States v. Frazier, 387 F.3d 1244 (11th Cir. 2004) (en banc), but Frazier imposes no such requirement.

Frazier does not require all experts to provide a quantitative basis for their opinions, as Barnes suggests.[4] Rather, Frazier requires experts who provide probabilistic opinions to also provide quantitative bases for them, such as scientific studies or quantified personal experiences. See id. at 1265.[5]

_____

[4]In Frazier, the district court excluded a forensic investigator's opinion that some transfer of hair, fibers or fluids from the perpetrator of a sexual assault to the victim "would be expected." Id. at 1252. This Court affirmed because: (1) the meaning of "expected" was imprecise and could mean a virtual certainty, a strong probability, a possibility that was more likely than not or just a possibility; and (2) the expert offered no reliable foundation, in the form of either studies or experience, to support "his 'expectancy' opinion." Id. at 1265-66. This Court explained that the reliability of the expert's opinion "that expresses an intrinsically probabilistic or quantitative idea" cannot be assessed when the expert does not provide the basis for that probabilistic or quantitative idea. Id. at 1265.

[5]The two other decisions Barnes cites are also inapposite and, in any event, are not binding precedent. See Kunz v. DeFelice, 538 F.3d 667, 675-76 (7th Cir. 2008) (concluding district court properly excluded police officer's expert witness who would have testified to

20

Here, the challenged experts did not express probabilistic or quantitative opinions. That is, none of the experts expressed a degree of likelihood or probability; rather, they said that something was a possibility and explicitly declined to opine as to probability. For example, McVicker testified that the test impressions he made with Barnes's boots "corresponded" (i.e., was "similar") to the crime scene impressions and that Barnes's boots "could have" made the prints left on the bank's counter top. However, McVicker did not testify to how likely it was that Barnes's boots, as opposed to any other person's boots, made the impressions. In fact, McVicker explained that the crime scene impressions were too distorted by movement to draw a more conclusive opinion.

Similarly, Koch testified that the hairs found in the back seat of the patrol car were "consistent" with hairs from the fake beard. Although Koch opined that it was possible the two hair samples came from the same source, she did not quantify how likely it was. Indeed, Koch explained that hair analysis, which compared hair evidence to known samples, could not provide this sort of quantitative information.

---

arrestee's ability to recall events after using heroin because, among other things, the expert "knew neither a baseline against which to judge whether [the arrestee] was impaired, nor [the arrestee's] habituation level"); <u>United States v. Carroll</u>, 450 F. App'x 937, 940 (11th Cir. 2012) (concluding that district court was within discretion to exclude polygraph evidence "when no expert witness was present to explain the meaning of and context of the results").

For this reason, we agree with the government that the expert opinions in this case are more akin to the expert opinion in United States v. Brown, 415 F.3d 1257 (11th Cir. 2005). In Brown, the district court admitted, over the defendant's Daubert objection, two chemists' opinions that the chemical structures of 1.4-butanediol, an industrial solvent, and GHB, a "date rape" drug, were "substantially similar." Brown, 415 F.3d at 1260. At trial, the chemists conceded that their "method and conclusions were not quantifiable or testable by the scientific method" but instead "were based on visual comparisons of the molecular models combined with expert knowledge of chemistry." Id. at 1267. The government did not submit any studies or papers indicating that this visual comparison methodology or the chemists' opinions had been subjected to peer review. Id. But, the chemists did testify that visual compariscon was the generally accepted methodology. Id. This Court affirmed, stressing the flexibile nature of the Daubert inquiry and the deferential abuse-of-discretion standard applied to a district court's reliability determination. Id. at 1267-68.

As in Brown, the forensic experts here used methodologies that did not allow for quantification, but that were generally accepted. Moreover, Defendant Barnes has not presented any evidence to the contrary. Under the circumstances of this case, we cannot say it was an abuse of discretion to admit the expert

opinions.

For all these reasons, we affirm Barnes's convictions.

**AFFIRMED.**