In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1064

LIZ ANDERSON, individually and as
Personal Representative of the Estate of
Jeff Anderson,

*Plaintiffs-Appellants,*

*v.*

GULF STREAM COACH, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:09-cv-00257-CAN–**Christopher A. Nuechterlein,** *Magistrate Judge.*

ARGUED JUNE 10, 2011—DECIDED NOVEMBER 3, 2011

Before BAUER, FLAUM and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Plaintiffs Jeff and Liz Anderson sued Gulf Stream, the manufacturer of their 2009 model year Tourmaster RV, claiming that the Tourmaster had numerous defects and that Gulf Stream misrepresented the size of the vehicle's engine. The district court

entered summary judgment in favor of Gulf Stream on all of the Andersons' claims.

We conclude that the district court erred in dismissing the Andersons' Indiana law claims for breach of express warranty and breach of implied warranty, and their federal claims under the Magnuson-Moss Act, on the ground that the Andersons did not give Gulf Stream a reasonable opportunity to cure. We find that the evidence, when viewed in the light most favorable to the Andersons, supports their contention that they gave Gulf Stream a reasonable opportunity to cure.

We also find that there is enough evidence in the record to support the Andersons' claim that Gulf Stream committed an "uncured" deceptive act under the Indiana Deceptive Consumer Sales Act in representing that the "2009" model Tourmaster featured a larger engine than the one the Andersons' "2009" Tourmaster came with. Although the pertinent federal regulations are not a model of clarity, we conclude that the regulations did not permit Gulf Stream to designate the Andersons' Tourmaster, which was completed during Gulf Stream's 2008 production cycle and had the characteristics of a 2008 model year Tourmaster, as a "2009" Tourmaster. However, because there are disputed questions of fact surrounding what information Gulf Stream disclosed to the Andersons, neither party is entitled to summary judgment on this claim.

Finally, we conclude that it was proper for the district court to enter summary judgment in favor of Gulf Stream with respect to the Andersons' claims for fraud and for

the commission of an "incurable" deceptive act under Indiana law because the evidence does not support the inference that Gulf Stream acted with an intent to deceive.

## I. BACKGROUND

In 2008, Jeff Anderson and his wife Liz Anderson decided to upgrade their 2008 Crescendo RV. The Andersons wanted to tour the western United States while Mr. Anderson's health still permitted it.[1] Since their Crescendo struggled up mountain roads, the Andersons decided to buy a more powerful vehicle. The Andersons were otherwise happy with their Crescendo, which had been manufactured by Gulf Stream, and so decided to look into Gulf Stream's other recreational vehicle models.

In August 2008, the Andersons contacted Mike Apple, the owner of Royal Gorge, an independent dealer of Gulf Stream vehicles. Royal Gorge had been in the business of selling recreational vehicles since 2006. On July 31, 2008, Royal Gorge had ordered a 2009 model year Tourmaster RV from Gulf Stream. Royal Gorge received several discounts on the purchase, including one for $12,500 because the vehicle had a 360 horsepower engine. Although Gulf Stream's invoice to Royal Gorge included a notation for the discount, Apple claims that

---

[1] Mr. Anderson, who had stage IV cancer at the time, passed away shortly before we heard oral argument in this case. We continue to refer to the plaintiffs as the "Andersons."

he had no prior experience with the Tourmaster line, and that the Gulf Stream salesman he spoke to never mentioned the 360 horsepower engine. Rather, when Apple asked about the Tourmaster's features, the salesman referred him to Gulf Stream's website, which listed only one engine for the 2009 model: a 425 horse-power Cummins diesel engine.

When the Andersons contacted Apple in August, he suggested they consider the Tourmaster. The Andersons first reviewed Gulf Stream's website on their own, and then looked at it together with Apple. The website "had a list of options" for 2009 model year Tourmasters, but "it had no list of options available for engines." Gulf Stream's webpage stated that the 2009 model came "standard" with a 425 horsepower Cummins diesel engine. A disclaimer at the bottom of the page stated:

> For further information and available floor plan options, contact your local dealer or Gulf Stream Coach, Inc. Gulf Stream Coach, Inc., reserves the right to make changes in prices, colors, materials, components and specifications and discontinue models at any time without notice or obligation.

In late August 2008, the Andersons flew to Colorado to inspect the Tourmaster at Royal Gorge. About a week later, the Andersons purchased the Tourmaster "as is" and "with all faults" for $223,000. They paid nearly $60,000 less than the manufacturer's suggested retail price.

Royal Gorge kept the Tourmaster for about a month before delivering it to the Andersons. During that time, Apple inspected the Tourmaster and fixed several prob-

lems with it. On September 5, 2008, Royal Gorge's technician, Jeff Rogers, drove the Tourmaster 700 miles to the Andersons in Texas. Rogers and the Andersons then spent some time going over the unit "as far as what all the buttons and bells and whistles do." Rogers advised the Andersons that "there [were] a bunch of rattles and minor things that were irritating to him during the drive." Mr. Anderson replied, "That's fine, we'll take care of it when we get back to Colorado."

Mrs. Anderson then signed the rest of the paperwork. She acknowledged in writing that she had "personally inspected" the Tourmaster and found it "acceptable for delivery." According to the Andersons, they "may have received" two Manufacturers' Certificates of Origin ("MCOs"). An MCO is required in Colorado for titling purposes. MCOs contain invoice numbers, shipping weight, and vehicle identification numbers ("VINs"), among other specifications. The Andersons' MCO included the number "360" under the notation "H.P.(S.A.E.)," indicating that the vehicle came with a 360 horsepower engine. The MCO also listed the model year of the Tourmaster as "2009."

In addition to the MCOs, the Andersons received a Recreational Vehicle Registration Form, a Dealer's Bill of Sale, and a Pre-Delivery Inspection Checklist. None of those documents stated that the Tourmaster came with a 360 horsepower engine. The Andersons were not given the manufacturer's suggested retail price ("MSRP") sheet, which listed the 360 horsepower engine. They also did not receive a copy of the invoice Gulf Stream gave

Apple, which also stated that the vehicle came with a 360 horsepower engine. Apple later testified in deposition that he did not look at the invoice until after he sold the Tourmaster to the Andersons. The invoice was labeled "STRICTLY CONFIDENTIAL," and Gulf Stream did not instruct Apple to share it with his customers.

The Andersons' Tourmaster came with a "Limited Warranty," that extended: (1) a one-year warranty under normal use against defects in Gulf Stream materials and/or workmanship in the construction of the recreational vehicle; and (2) a two-year warranty under normal use against structural defects in Gulf Stream materials and/or workmanship in the construction of floors, walls, and roof. The warranty also stated in relevant part that:

> If an issue occurs which the Purchaser believes is covered by this Limited Warranty, Purchaser is responsible to promptly contact Gulf Stream . . . . Gulf Stream reserves the right to cure all warranty claims.

The Andersons only used the Tourmaster twice. Shortly after purchasing it, they claim that they began to experience numerous problems with it, including: (1) water leaking "like crazy" from the ceiling fans and windows; (2) bowed flooring due to incorrectly installed floor joists; (3) noisy air leaks; (4) pink water coming from the kitchen tap; (5) missing slides, which allowed water to leak into the bedroom and get the carpet "absolutely soaking wet"; and (6) electrical problems with several appliances, including the television.

After discovering the problems, the Andersons took the Tourmaster to Royal Gorge for repairs, free of charge. Starting in September, Apple claims that he spent "hundreds of hours" attempting to repair all of the problems with the Tourmaster. Royal Gorge forwarded Gulf Stream warranty claims for the repairs. The record contains numerous pages of such claims dating from September 2008 to January 2009.

While Apple was performing the repairs, he examined the Tourmaster's engine in response to complaints about a lack of engine power. He claims that it was then that he "discovered" that the Tourmaster had a 360 horsepower engine. Apple also maintains that the "structural unsoundness and poor workmanship [of the Tourmaster] . . . have made it impossible [to fix to an acceptable level]."

On January 23, 2009, after an alleged "back and forth" with Gulf Stream, the Andersons' attorney wrote a letter to Gulf Stream. In the letter, the Andersons listed the problems they had experienced with the Tourmaster. They also explained that they had ordered the Tourmaster, "in large part because it was advertised on Gulfstream's website as having a 425HP Diesel Motor, [but] after delivery the Andersons discovered that the RV had only a 360HP Diesel Motor." As a result, they claimed that the Tourmaster was "underpowered." The Andersons advised Gulf Stream that "if this matter is not resolved within . . . the next 60 days, suit will be filed against Gulfstream."

Several days later, Aaron Druesdow, a "fully authorized" representative of Gulf Stream, met Mr. Anderson at

Royal Gorge to inspect the Tourmaster. According to Mr. Anderson, Druesdow acknowledged the problems with the Tourmaster and offered to take it to Gulf Stream's plant in Indiana to be fixed. Mr. Anderson did not want the Tourmaster to be taken to Indiana, but he claims that although Druesdow at first thought that the Tourmaster could not be fixed at Royal Gorge because of all the work that would have to be done to the floors, after two or three hours, Druesdow "agreed that he would work with Mike Apple at Royal Gorge to get the floor joists repaired." Druesdow also allegedly agreed "to ship new windows, a new motor, [and to] fix up all the problems." A few weeks later, "two or three windows" arrived from Gulf Stream, but after "a couple of other minor things . . . it all stopped."

On March 27, 2009, more than 60 days after the Andersons sent their January letter, Gulf Stream sent a letter to the Andersons offering to extend its written warranty six months and to take the Tourmaster back to its factory in Indiana for repairs. On April 6, 2009, the Andersons sent a response accepting Gulf Stream's offer. Ten days later, the Andersons sued.

During discovery in this case, the Andersons learned that Gulf Stream had manufactured the Tourmaster in response to an order for a 2008 model Tourmaster. That order was cancelled, and Gulf Stream did not sell the Tourmaster for several months until it was sold to Apple. It was then that Gulf Stream assigned the Tourmaster a "2009" model year.

Before the district court, both parties moved for summary judgment. The court entered summary judgment

against the Andersons on all of their claims. The Andersons appeal, seeking a trial on all of their claims, except their Indiana Deceptive Consumer Sales Act claim, on which they seek summary judgment.

### III. ANALYSIS

We review a district court's decision to grant summary judgment de novo, viewing all facts and reasonable inferences in favor of the nonmoving party. *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010). The Andersons sued Gulf Stream for breach of express warranty, breach of the implied warranty of merchantability, violations of the Magnuson-Moss Warranty Act ("MMWA"), violation of the Indiana Deceptive Consumer Sales Act, and fraud.[2]

### A. Warranty Claims Survive Summary Judgment

The Andersons' state law claims for breach of express and implied warranties are related to their claims under the MMWA. The MMWA is a remedial statute designed to protect consumers against deceptive warranty practices. *Skelton v. Gen. Motors Corp.*, 660 F.2d 311, 313 (7th Cir. 1981). It provides a federal private cause of action for a warrantor's failure to comply with the terms of a "written warranty, implied warranty or service contract."

---

[2] The Andersons also sued for breach of the implied warranty of fitness for a particular purpose. They have since dropped that claim.

*Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 522 (7th Cir. 2003) (quoting 15 U.S.C. § 2310(d)(1)).

The MMWA distinguishes between two kinds of written warranties: full warranties and limited warranties. *See* 15 U.S.C. § 2303(a). Written warranties must be "clearly and conspicuously" designated as one or the other. *Id.* Sections 2303(a) and 2304(a) of the MMWA impose minimum federal standards for "full" warranties and provide remedies for their breach. The remedies are either a full refund of the purchase price or a replacement of the product if the warrantor cannot remedy the defects or malfunctions after a reasonable number of attempts to do so.[3] *See* § 2304(a).

"Limited" warranties and "implied" warranties are not subject to the same standards as "full" warranties. *See Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1062 (5th Cir. 1984); *see also* §§ 2303, 2304. But the MMWA "allows consumers to enforce [limited] written and implied warranties in federal court, [as provided in section

---

[3] For consumers bringing a claim under the MMWA for breach of a full warranty, the Act provides that the warrantor must permit the consumer to elect a refund or replacement after "a reasonable number of [failed] attempts by the warrantor to remedy defects." § 2304(a). The district court relied on cases citing to that provision in concluding that the Andersons had to give Gulf Stream at least two opportunities to cure. But that section of the statute concerns only claims for breach of full warranties, whereas the Andersons sued Gulf Stream for breach of its "Limited" Warranty.

2310(d)(1),] borrowing state law causes of action.*" Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004); *see also* § 2310(d)(1). To bring an action under section 2310(d)(1), the consumer must give the warrantor "a reasonable opportunity to cure" its failure to comply with "an obligation under any written or implied warranty." § 2310(e) ("No action . . . may be brought under subsection (d) . . . under any written or implied warranty or service contract . . . unless the [warrantor] . . . is afforded a reasonable opportunity to cure such failure to comply."). Successful consumers may also recover attorneys' fees. *See* § 2310(d)(2).

As this discussion suggests, for all practical purposes, the MMWA operates as a gloss on the Andersons' state law breach of warranty claims.[4] The MMWA allows the Andersons to bring federal claims premised on state law violations, but also requires them to give Gulf Stream a reasonable opportunity to cure. The MMWA does not, however, prevent the Andersons from bringing their state law claims along with their federal claims.

The Andersons sued Gulf Stream under Indiana's version of the Uniform Commercial Code. *See* IC 26-1-2-101 ("IC 26-1-2 shall be known and may be cited as Uniform Commercial Code–Sales."). Their first claim, for breach of Gulf Stream's Limited Warranty, was brought under section 26-1-2-714(1), which provides that

---

[4] To be clear, the Andersons' complaint asserts two state law breach of warranty claims. The complaint also asserts a violation of the MMWA, which is premised on the state law claims.

when "the buyer has accepted goods and given notifica-
tion (IC 26-1-2-607(3)), he may recover . . . for any non-
conformity of tender." The district court entered
summary judgment in favor of Gulf Stream on this
claim because, although the court concluded that the
Andersons gave Gulf Stream adequate notice, the court
found that the Andersons did not give Gulf Stream a
reasonable opportunity to cure. The Andersons contend
that the court erroneously conflated their MMWA and
Indiana law claims because Indiana law, unlike the
MMWA, does not require a buyer asserting a breach
of express warranty claim to give the seller a reasonable
opportunity to cure. They also contend that, in any
event, they did give Gulf Stream a reasonable
opportunity to cure. Gulf Stream disagrees with the
Andersons' characterization of Indiana law, and further
contends that the Andersons' notice was inadequate. *See*
*United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1925)
("[T]he appellee may, without taking a cross-appeal, urge
in support of a decree any matter appearing in the
record, although his argument may involve an attack
upon the reasoning of the lower court or an insistence
upon matter overlooked or ignored by it.").

   We address the question of notice first. Section
26-1-2-607(3) requires a buyer to give the seller notice
before bringing suit for breach of warranty. *See* IC 26-1-2-
607(3) ("Where a tender has been accepted: the buyer
must, within a reasonable time after he discovers or
should have discovered any breach, notify the seller of
breach or be barred from any remedy."). In Indiana, unlike

in some other jurisdictions with similar provisions,[5] the requirement of notice under section 26-1-2-607(3)(a) is satisfied if the seller has "actual knowledge" that the goods are nonconforming. *See Agrarian Grain Co., Inc. v. Meeker*, 526 N.E.2d 1189, 1193 (Ind. Ct. App. 1988) ("[T]he notice required by IC 26-1-2-607(3)(a) is satisfied by the [seller's] actual knowledge there are some problems with the goods.") (citing *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 554 (Ind. Ct. App. 1987) ("Under IC 2-607(3)(a), the notice is sufficient if it simply informs the seller that there are some problems with the goods.")); *see also B & B Paint Corp. v. Shrock Mfg., Inc.*, 568 N.E.2d 1017, 1019 (Ind. Ct. App. 1991) (notice requirement satisfied when buyer told seller that purchased paint had caused fire).

There is ample evidence in the record to support the district court's conclusion that Gulf Stream had actual notice of the Tourmaster's alleged defects. Over a period of five months from September 2008 to January 2009, Apple forwarded over sixty pages of warranty claims to Gulf Stream describing the Tourmaster's problems. Gulf Stream received those warranty claims and kept them in its files. The Andersons also sent Gulf Stream a letter in January advising Gulf Stream of the problems they were

---

[5] *See, e.g., S. Ill. Stone Co. v. Universal Eng'g,* 592 F.2d 446, 452 (8th Cir. 1979) ("It is not enough that the seller be given notice of the mere facts constituting a nonconforming tender; he must also be informed that the buyer considers him to be in breach of the contract.") (citing cases).

having with the Tourmaster. In response, Gulf Stream sent a representative to Royal Gorge to inspect the Tourmaster, and the representative and Mr. Anderson discussed the Tourmaster's problems. Gulf Stream therefore undoubtedly realized that the Tourmaster had multiple defects—including the air and water leaks, malfunctioning step cover, and bowed and noisy floors of which the Andersons complain. *See Agrarian*, 526 N.E.2d at 1193 (trial court's finding that seller knew of goods' defects and of buyer's dissatisfaction with goods was sufficient to fulfill the notice requirement of IC 26-1-2-607(3)(a)).

The district court nevertheless rejected the Andersons' claim for breach of express warranty because it concluded that the Andersons did not give Gulf Stream a reasonable opportunity to cure. The parties dispute whether Indiana law requires buyers to give sellers a reasonable opportunity to cure before filing suit.

There is authority for the proposition that the purpose of the notice requirement is, in significant part, to give the seller an opportunity to cure. *See Courtesy Enters., Inc. v. Richards Labs.*, 457 N.E.2d 572, 577 (Ind. App. Ct. 1983) (explaining that the most important policy consideration underlying the notice requirement under IC 26-1-2-607(3)(a) is to "enable the seller to settle the issue through negotiation or other non-litigious means"). However, the only Indiana court to have squarely addressed this issue has concluded that the buyer only has to give the seller a reasonable opportunity to cure if the terms of the warranty impose that requirement. *Aamco*

*Transmission v. Air Sys., Inc.*, 459 N.E.2d 1215, 1217 (Ind. Ct. App. 1984) ("Although our research reveals cases in which the opportunity to remedy defects was a condition precedent to the [buyer's right] . . . to declare a breach of warranty, [in those cases] the opportunity to remedy defects was [required by the terms of the warranty]. Here [there is no such term and therefore an opportunity to cure was not a condition precedent to the buyer's suit for breach of warranty].")। In deciding questions of state law, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently. *See Thomas v. H&R Block E. Enters.*, 630 F.3d 659, 663 (7th Cir. 2011). Gulf Stream does not contend that *Aamco* is not good law or that we should not follow it.

In the alternative, Gulf Stream locates the opportunity to cure requirement in the warranty itself, which states: "Gulf Stream reserves the right to cure all warranty claims." But Gulf Stream did not make this argument or mention the provision of the Limited Warranty reserving the right to cure in its motion for summary judgment before the district court, and as a result has waived this contention. *See Kunz v. DeFelice*, 538 F.3d 667, 681 (7th Cir. 2008) (failure to adequately present an issue to the district court waives the issue on appeal).

Regardless, viewed in the light most favorable to the Andersons, the record supports their claim that Gulf Stream was given a reasonable opportunity to cure. The Andersons took the Tourmaster back to Royal Gorge for repairs many times from September 2008 to Janu-

ary 2009. Numerous warranty claims were sent to Gulf Stream over that time period describing the problems with the Tourmaster. Then, on January 23, 2009, the Andersons' attorney sent Gulf Stream a letter listing the various problems (29 issues) with the Tourmaster and complaining about the 360 horsepower engine. Five days later, Gulf Stream sent its representative to Royal Gorge to talk to Mr. Anderson and to offer to take the Tourmaster to Gulf Stream's plant in Indiana for repairs. The district court construed Mr. Anderson's initial refusal to allow the Tourmaster to be taken to Indiana as a complete rejection of Gulf Stream's offer to make repairs. That was error. The district court disregarded Mr. Anderson's additional testimony that the representative "agreed that he would work with Mike Apple at Royal Gorge to get the floor joists repaired" at Royal Gorge, and "agreed to ship new windows, a new motor, [and to] fix up all the problems." Mr. Anderson also testified that a few weeks later several windows arrived from Gulf Stream, but "then it all stopped."

It was not until March 27, 2009, that Gulf Stream sent a letter to the Andersons offering to extend its warranty and to take the Tourmaster back to its factory in Indiana for repairs. At that point, nearly two months had passed since Gulf Stream had offered but failed to send parts to Royal Gorge. Gulf Stream could have cured by honoring its commitment to work with Apple to repair the Tourmaster. It did not. Gulf Stream now complains that the Andersons sued "only ten days" after receiving Gulf Stream's March 27 letter. But a buyer does not have to wait indefinitely for the seller

to cure. The Andersons gave Gulf Stream plenty of time to fix the problems with the Tourmaster. The district court erred in rejecting both the Andersons' state law breach of express warranty claim and the Andersons' MMWA claim for failure to give Gulf Stream a reasonable opportunity to cure.

We now turn to the Andersons' breach of implied warranty of merchantability claim. To resolve that issue, we must first address a point about the MMWA that it is relevant to the analysis. In addition to allowing consumers to bring federal claims premised on written warranties, the MMWA allows consumers to bring claims for violations of implied warranties, which the MMWA defines as a warranty under state law. *See* 15 U.S.C. §§ 2310(d), 2301(7). The MMWA prohibits suppliers from disclaiming or modifying any implied warranty to a consumer, except that the duration of an implied warranty may be limited for a reasonable period of time and such limitation must be "conscionable" and "set forth in clear and unmistakable language and prominently displayed on the face of the warranty." § 2308(a), (b); *see also Boelens*, 748 F.2d at 1062.

Gulf Stream's Limited Warranty purports to disclaim state law implied warranties, but the district court concluded that the disclaimer was ineffective because of the proscription in the MMWA. Gulf Stream does not challenge that ruling and we do not disturb it.

Nevertheless, the district court entered summary judgment in favor of Gulf Stream because it concluded that the MMWA permitted Gulf Stream to limit the

Andersons' "remedies" for breach of implied warranty.
Without discussing any specific provision of the Limited
Warranty, the court stated that Gulf Stream had limited
the Andersons' remedies in the express warranty to
require the Andersons to give Gulf Stream a reasonable
opportunity to cure, which the court concluded the
Andersons did not do.

In determining that Gulf Stream could limit the
remedies available for breach of implied warranty, the
court relied upon *Hahn v. Ford Motor Co., Inc.*, 434 N.E.2d
943, 952-53 (Ind. Ct. App. 1982). In that case, the court
held that "disclaimers," which are prohibited by the
MMWA, are different from "limitations of remedies,"
which are not. *See id.* We need not decide whether
*Hahn* correctly construed the MMWA to permit a seller
to limit remedies available to the buyer. In discussing
"remedies," the court in *Hahn* was referring to the form
of relief available to the plaintiff (for example, consequen-
tial as opposed to incidental damages). *See id.* Requiring
the Andersons to give Gulf Stream an opportunity to
cure is not the kind of "limitation of remedies" contem-
plated by *Hahn*. And even if Gulf Stream could be said
to have limited the Andersons' "remedies" to require
them to give Gulf Stream a reasonable opportunity to
cure, as explained earlier, there is enough evidence in
the record from which a reasonable jury could con-
clude that the Andersons satisfied that requirement.

Two other points with respect to the Andersons' claim
for breach of the implied warranty of merchantability
must be addressed. First, the district court found that

the Andersons inspected the Tourmaster before accepting it. As a result, the court concluded that the Andersons could maintain a claim only for latent (but not for patent) defects. *See Richards v. Goerg Boat & Motors, Inc.*, 384 N.E.2d 1084, 1093 (Ind. Ct. App. 1979) (abrogated in part on different grounds) ("In so far as [the buyer] made an examination which would have disclosed the defects he later alleged . . . no implied warranty of merchantability or fitness . . . would be sustainable as to those defects. . . . However, . . . such a result would not pertain to latent defects . . . ."). The Andersons have no quarrel with the rule, but contest which defects were patent and which were latent. This is a question of fact to be decided by the jury on remand.

Second, Gulf Stream contends on appeal that the Andersons' claim for breach of the implied warranty of merchantability fails with respect to the 360 horsepower engine because the Andersons do not contend that the engine is defective. Gulf Stream waived this argument by not raising it with the district court. *See Kunz*, 538 F.3d at 681. We note, however, that the implied warranty of merchantability is a warranty that goods shall be "merchantable." IC § 26-1-2-314. This at least means that the goods are fit for the ordinary purposes for which such goods are used. *Id.; Woodruff v. Clark Cnty. Farm Bureau Coop. Ass'n*, 286 N.E.2d 188, 194 (Ind. Ct. App. 1972). It also means that the goods conform to promises or affirmations of fact made on the container or label, if any. IC § 26-1-2-314. Since the district court did not decide the question, we will not consider whether the smaller engine can form the basis of a claim for breach of the

implied warranty of merchantability either because it rendered the Tourmaster unfit for its ordinary uses or because the Tourmaster did not conform to any promises made by Gulf Stream.

In sum, we conclude that the Andersons are entitled to proceed on their claim for breach of the implied warranty of merchantability. *Cf. Jones v. Abriani*, 350 N.E.2d 635, 645 (Ind. Ct. App. 1976) (concluding that seller of mobile home breached the implied warranty of merchantability because "the mobile home in question was clearly below average, of poor quality, and was not fit for its ordinary purpose, i.e., to serve as a modern, comfortable home where one can entertain guests without being embarrassed about bald carpets, crooked doors, and a leaky roof"). Since their state law implied warranty claims survives, and Gulf Stream was given a reasonable opportunity to cure, the Andersons are also entitled to proceed on their MMWA claim.

## B. Indiana Deceptive Consumer Sales Act Claim Survives Summary Judgment

We now turn to the Andersons' claim under the Indiana Deceptive Consumer Sales Act ("IDCSA"), which is premised on Gulf Stream's alleged mislabeling of the Tourmaster. The Andersons contend that it was improper for Gulf Stream to have designated the Tourmaster as a 2009 model because the Tourmaster was manufactured to fulfill an order for a 2008 model year Tourmaster and did not have the characteristics of a 2009 Tourmaster. The district court concluded that federal

regulations permit a second-stage manufacturer that builds multi-stage vehicles, such as Gulf Stream, to assign model years in this fashion. Gulf Stream contends that, as a result, the Andersons' claim under the IDCSA fails because the IDCSA "does not apply to an act or practice that is . . . expressly permitted by federal law, rule, or regulation." *See* IC § 24-5-0.5.6.

Multi-stage vehicles are motor vehicles that are produced in two or more stages. *See* Federal Motor Vehicle Standards; Roof Crush Resistance, 76 Fed. Reg. 15903-01 (proposed Mar. 22, 2011) (to be codified at 49 C.F.R. pt. 571). These vehicles are not produced by a single manufacturer on an assembly line as is the typical passenger car or sport utility vehicle. *Id.* Instead, one manufacturer produces an "incomplete vehicle," which in turn requires further manufacturing operations by a second manufacturer to become a completed vehicle. *Id*. An "incomplete vehicle" is an assemblage consisting, at a minimum, of the chassis, power train (which includes the engine), steering system, suspension system, and braking system, in the state that those systems are to be part of the completed vehicle, but that requires further manufacturing operations to become a completed vehicle. 49 C.F.R. § 567.3 (1996).

In 1975, the Federal Trade Commission ("FTC") published a statement of its Enforcement Policy regarding the designation of model years to motor vehicles to guide manufacturers and distributors in assigning model years to all vehicles, including incomplete vehicles used in the construction of motor homes. Enforcement Policy Regarding Designation of Model Year

of Motor Vehicles, 40 Fed. Reg. 23845 (June 3, 1975), codified at 16 C.F.R. § 14.11 (1975). The FTC was concerned about the misleading standards used by some manufacturers to designate model years. *Id.* In particular, several manufacturers were changing the model years displayed on the Certificates of Origin of vehicles that remained unsold at the end of a model year to suggest that the vehicles had been manufactured during the upcoming model year. *Id.* Other manufacturers were basing model year designations on the date of ultimate sale to retail purchasers. *Id.* The FTC was concerned that those practices "might mislead buyers as to the date of manufacture" and "may . . . hinder market forces that normally lead to price cuts at the end of model years." *Id.*

Four years later, in 1979, the FTC revised its Enforcement Policy Statement to add an exception for chassis or incomplete vehicles sold to motor home or recreational vehicle manufacturers who issue separate Certificates of Origin for completed vehicles. Enforcement Policy Regarding Designation of Model Year of Motor Vehicles, 44 Fed. Reg. 30322 (May 25, 1975), codified at 16 C.F.R. § 14.11 (1979). The 1979 Policy Statement exempted chassis and incomplete vehicle manufacturers from assigning a model year to their products as long as they put the words "Model Year" or "Year" on the Certificate of Origin, followed by "NA" or "Not Applicable" or "None." *Id.*

Shortly after it issued the 1979 Policy Statement, the FTC entered into consent agreements with most manufacturers of heavy duty trucks and other vehicles. *See, e.g.,*

*Mack Trucks, Inc.*, 94 F.T.C. 236 (1979); *Chrysler Motors Corp.*, 94 F.T.C. 245 (1979). The consent agreements settled allegations that vehicle manufacturers both directly and through their dealers had misrepresented the model year of certain vehicles by "redesignating" Certificates of Origin and other documents to reflect the forthcoming year, rather than the model year when the vehicles had actually been manufactured. *Id.* The consent agreements tracked the provisions set out in the Commission's 1979 Policy Statement and expressly incorporated the exemption for chassis and incomplete vehicles that are not titled or registered and that have separate Certificates of Origin prepared by the final vehicle manufacturer. *Id.* In 1995, the FTC stopped publishing its Enforcement Policy Statement in the Code of Federal Regulations after determining that it was unnecessary and superfluous in light of the guidance provided by the 1979 consent agreements.[6] *See* Administrative Interpretations, General

---

[6] The withdrawal of the policy statements may have led to more, rather than less, confusion in the industry. The defendants in this litigation, for example, have argued to us that the consent agreements only apply to the specific vehicle manufacturers named in the agreements. This is clearly not what the FTC intended in withdrawing the policy statements in favor of the consent agreements. The FTC could have simplified things by keeping the policy statements, which are published in the code of federal regulations, rather than requiring manufacturers to track down the 1995 Federal Register in order to discover that the former policy statements are now incorporated in the consent agreements.

Policy Statements, and Enforcement Policy Statements, 60 Fed. Reg. 42031-02 (Aug. 15, 1995) (no subsequent codification).

Federal regulations define "model year" as the year used to designate a "discrete vehicle model," irrespective of the calendar year in which the vehicle was actually produced, provided that the production period does not exceed 24 months. 49 C.F.R. § 565.12(m). Since manufacturing recreational vehicles is a two-stage process for Gulf Stream, the chassis manufacturer (Freightliner in this case) does not have to assign a model year to the chassis in its Certificate of Origin. Gulf Stream may then assign a model year to the completed recreational vehicle that is within two years of the date in which the chassis was manufactured. *See id.*

All of this just means that a final-stage manufacturer such as Gulf Stream can use a chassis manufactured in 2007 in a 2008 or a 2009 model year recreational vehicle. However, it does not mean that the rest of the principles outlined in the consent agreements are inapplicable to a final-stage manufacturer such as Gulf Stream. The consent agreements except only manufacturers of incomplete vehicles from having to designate a model year when otherwise required by state law.[7] Contrary to Gulf Stream's suggestion that the consent agreements apply only to single-stage manufacturers, there is nothing in the consent agreements, or in the regulations the consent

---

[7] Although not relevant here, a manufacturer need not place a numerical model year on a Certificate of Origin if a state does not require it. *See Mack Trucks*, 94 F.T.C. 236.

agreements replaced, that suggests that multi-stage manufacturers operate under different constraints when it comes to assigning model years to a finished product than single-stage manufacturers. Gulf Stream does not argue, for example, that once it assigns a model year on a Certificate of Origin to one of its finished recreational vehicles, it may "reassign" or update the model year if it fails to sell the unit. This practice is clearly barred by the consent agreements for both single-stage and multi-stage manufacturers. More generally, the concerns reflected in the consent agreements and the supplanted regulations—that reassigning or assigning model years upon sale can mislead buyers and hinder market forces that lead to price cuts at the end of model years—are the same whether the manufacturer is a single-stage manufacturer or final-stage manufacturer selling a finished product.

The Andersons claim (and Gulf Stream does not dispute) that Gulf Stream manufactured the Tourmaster at issue here in response to an order dated September 29, 2007 requesting a 2008 model Tourmaster with the then-standard 360 horsepower engine. The chassis of the Tourmaster at issue here was manufactured in 2007. The Tourmaster was completed before Gulf Stream switched to the production of 2009 model year vehicles in February 2008. Because the order was cancelled, the Andersons' Tourmaster sat at Gulf Stream's facility for several months until it was sold to Apple. When Gulf Stream sold the Tourmaster to Apple, it assigned the Tourmaster a 2009 model year.

Gulf Stream contends that it was permitted to assign the Tourmaster a 2009 model year because, as a multi-stage manufacturer, it was allowed to put an older chassis—the 2007 chassis that came with a 360 horsepower engine—in any finished recreational vehicle manufactured within two years (or up to 2009). *See* 49 C.F.R. § 565.12(m) (2008). But while manufacturing a "split model year" vehicle with an older chassis is permitted, Gulf Stream's argument overlooks the fact that it designed and completed the Tourmaster in its 2008 production cycle. As explained above, there is no exception in the consent agreements with respect to model year designations for the finished product of final-stage manufacturers. The consent agreements provide that a manufacturer cannot represent a vehicle "in any document . . . or in any advertisement" as being a particular model year unless "the designation standards are uniformly applied throughout a model year to all vehicles of the same model assigned a model year designation." *See Mack Trucks*, 94 F.T.C. 236. Model year designations must be made in "accordance with written designation standards which clearly identify the vehicles to which they apply and *the starting dates when such standards take effect*." *Id.* (emphasis added). The model year assigned to a vehicle is to be determined by either the "characteristics of the vehicle designated" or by the "date of manufacture." *Id.* Here, Gulf Stream did not follow either protocol because the characteristics of the Andersons' Tourmaster were not consistent with those of the 2009 model year Tourmaster, and the date of manufacture of the final product preceded Gulf Stream's 2009 model year production.

We emphasize that we do not read the FTC's regulations to necessarily preclude Gulf Stream from using an older chassis in a newer vehicle or even the same chassis in a 2008 model and a 2009 model. It is common in the industry to manufacture "split model year" vehicles. *See, e.g.,* Policy Positions of the American Association of Motor Vehicle Administrators, *available at*: http://www. aamva.org/aamva/DocumentDisplay.aspx?id={3A9338F2-024D-460A-AB2B-F405394B9075} (last visited October 24, 2011). This makes sense in light of the delay involved in the multi-stage manufacturing process not present in the single-stage manufacturing process. *See* Federal Motor Vehicle Standards; Roof Crush Resistance, 76 Fed. Reg. 15903-01 (proposed Mar. 22, 2011) (to be codified at 49 C.F.R. pt. 571). What the regulations do not appear to contemplate, however, is for a manufacturer such as Gulf Stream to assign a 2009 model year to a vehicle designed for, with the characteristics of, and completed during, its 2008 model year production cycle.[8] Permitting

---

[8] Gulf Stream suggests in its brief that it has a practice of only designating model years on Certificates of Origin when it sells a vehicle to one of its dealers. But Gulf Stream cannot argue that this practice is permitted by the regulations under all circumstances because Gulf Stream acknowledges that the model year of the finished product must be within two years of the year of the chassis. Thus, Gulf Stream would have to agree that it could not have designated the model year of the Tourmaster at issue here as 2010 if Gulf Stream had sold it in 2010 because the chassis was built in 2007 and there would be a three-year difference between the finished product and the chassis.

such a practice could result in precisely the kinds of consequences the FTC sought to avoid: misleading buyers as to the date of manufacture and hindering market forces that lead to price cuts at the end of model years. We therefore conclude that the district court erred in concluding that federal regulations permitted Gulf Stream to designate the Andersons' Tourmaster as a "2009" model.

We must still decide, however, whether the Andersons can proceed on their IDCSA claim. The IDCSA identifies nineteen deceptive acts that sellers may not engage in. IC 24-5-0.5-3(a). The Andersons contend that Gulf Stream violated the IDCSA's provision prohibiting oral or written representations to the effect that "such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and the supplier knows or should reasonably know that it is not." IC 24-5-0.5-3(a)(2).

The IDCSA classifies deceptive acts into "incurable" and "uncured" deceptive acts. An act is "incurable" and immediately actionable without notice to the seller if the seller committed the act with intent to defraud or mislead. *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 647 (Ind. Ct. App. 2004). Otherwise, a deceptive act is actionable if it is "uncured," that is, if the manufacturer does not respond within 30 days of receiving notice of the deceptive act, in writing, with an "offer to cure."

The Andersons contend that Gulf Stream committed an uncured deceptive act by stating on its website that the 2009 model year Tourmaster came "standard" with a

425 horsepower engine when their "2009" Tourmaster came with a smaller engine. They further argue that they sent a letter notifying Gulf Stream that this was a deceptive act on January 23, and that Gulf Stream did not respond until March 27, more than 30 days after the period provided in the IDCSA for uncured acts. Gulf Stream maintains that it did not engage in a deceptive act because the statement on its website was true when made, because it could lawfully designate the Tourmaster as a 2009 model, because it reserved the right in its website to make modifications, and because the Andersons received at least one document indicating that the Tourmaster had a 360 horsepower engine.

As to Gulf Stream's first contention, the statement on the website that 2009 Tourmasters came with a 425 horsepower engine, which, according to the Andersons, induced them to purchase the Tourmaster, was inaccurate, at least with respect to the Andersons' 2009 Tourmaster. Nor, for the reasons explained above, are we convinced that federal regulations permitted Gulf Stream to designate the Tourmaster as a 2009 model. The reservation of rights also does not help Gulf Stream. It would not be reasonable to construe the statement that Gulf Stream "reserves the right to make changes in prices, colors, materials, components and specifications and discontinue models" to mean that Gulf Stream could, without apprising the consumer, change the size of something so fundamental to the vehicle as the engine, especially in light of the fact that a 425 horsepower engine was the only option listed for 2009 models.

There are, however, disputed issues of fact surrounding the Andersons' receipt of the MCO that preclude granting summary judgment to either party. The Andersons allegedly received two MCOs indicating that their Tourmaster had a 360 horsepower engine. Apple also received several documents listing the 360 horsepower engine, but he did not give those to the Andersons, and he claims not to have realized that the Tourmaster came with a 360 horsepower engine. Gulf Stream argues that the Andersons cannot prevail because Gulf Stream disclosed the engine's horsepower in the MCO. But an MCO is not a document that is intended for consumers; it is intended for the state and includes the horsepower of the vehicle (listed as "H.P. (S.A.E.)") among a list of other numbers that a consumer would not necessarily know how to decipher (such as VIN number, "date," etc).

The Andersons claim that even if they received the MCOs, they either did not see or did not understand the notation, and that the size of the engine was not included in any of the documents that a consumer would reasonably look to in order to learn about the features of a vehicle. Drawing all inferences in the Andersons' favor, their reliance on Gulf Stream's statements on Gulf Stream's website in forming a belief or expectation as to the size of the engine they were getting was reasonable, especially in light of the lack of any other consumer-oriented documentation stating otherwise. However, the Andersons are not entitled to summary judgment on this claim because whether the Andersons saw the MCO or should have understood from that

document that the Tourmaster came with a 360 horse-power engine is a disputed question of fact for the jury.

Gulf Stream also contends that the Andersons' IDCSA claim fails because the Andersons did not give proper notice under the IDCSA. But the cases Gulf Stream relies on are distinguishable. In both cases, the consumers did not apprise the seller of the alleged deceptive act. *See A.B.C. Home v. Plummer*, 500 N.E.2d 1257, 1261-62 (Ind. Ct. App. 1986) (failed to identify the advertisement containing the allegedly deceptive statement); *Lehman v. Shroyer*, 721 N.E.2d 365, 368 (Ind. Ct. App. 1999) (consumer failed to identify that price advertised was deceptive). Here, in contrast, the Andersons' January 23 letter stated that: "The Andersons ordered the RV, in large part, because it was advertised on Gulfstream's website as having a 425 HP [engine]. After delivery, the Andersons discovered that the RV had only a 360 HP engine." This was enough to put Gulf Stream on notice.

## C. Summary Judgment on Fraud and "Incurable" Deceptive Act was Proper

Gulf Stream is entitled to summary judgment on the Andersons' remaining state law claims for fraud and for Gulf Stream's commission of an "incurable" deceptive act under the IDCSA. Both require plaintiffs to prove that the defendant acted with intent to deceive. *See Doe v. Howe Military School*, 227 F.3d 981, 990 (7th Cir. 2000) (discussing elements of fraud); *Perry*, 814 N.E.2d at 647 (discussing uncured deceptive act under the IDCSA). The

Andersons have not produced evidence to enable a reasonable jury to find that Gulf Stream acted with an intent to deceive. Gulf Stream gave Apple several documents disclosing the correct horsepower of the vehicle. At least one of those documents (the MCO) was expected to make its way into the Andersons' hands because it is required by the state for titling purposes. Under these facts, these disclosures are inconsistent with an intent to deceive. While the record would enable a reasonable jury to find that Gulf Stream was negligent, the Andersons have not come forth with evidence that Gulf Stream intended to deceive them. *See Diersen v. Chi. Car Exch.*, 110 F.3d 481, 488 (7th Cir. 1997) ("'mere negligence' is by no means the same as 'intent to defraud'").

### III. CONCLUSION

The judgment of the district court is REVERSED IN PART and AFFIRMED IN PART. Circuit Rule 36 shall apply on remand.