NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 13a0316n.06

No. 11-4193

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Apr 01, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| STA-RITE INDUSTRIES, LLC and PENTAIR PUMP GROUP, INC., | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| FRANKLIN ELECTRIC CO., INC., | ) ) | |
| Defendant-Appellee. | ) | |

BEFORE:    SUTTON, STRANCH, Circuit Judges, and STEEH,[*] District Judge.

STEEH, District Judge.  Plaintiffs-Appellants Sta-Rite Industries, LLC and Pentair Pump Group, Inc. ("Pentair") appeal the district court's grant of summary judgment to Defendant-Appellee Franklin Electric Co., Inc. ("Franklin") on Pentair's breach of contract and tortious interference claims.  Because Pentair's breach of contract claim rests upon an interpretation of the parties' agreement that is contrary to its plain meaning and its claim of tortious interference is barred by the statute of limitations, we AFFIRM.

## I.  Overview

In 2001, Pentair and Franklin entered into a written sales agreement.  Pentair is a manufacturer of submersible pumps used in residential wells.  Franklin manufactures submersible

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

motors used in these submersible pumps. Pentair couples the motors it buys from Franklin with its own pumps and sells the product to distributors. Franklin manufactures both small and large motors. The small motors are 4-inch submersible electric motors rated 1/3 to 2 horsepower (the "Units"). The large motors are 4-inch submersible electric motors rated above 2 HP, 6-inch submersible motors, 8-inch submersible motors, control boxes, and other accessories (the "Non-Units"). The 2001 sales agreement only covered the sale of Franklin's small motors, the Units, to Pentair.

Historically, Franklin sold its submersible motors exclusively through original equipment manufacturers ("OEMs") such as Pentair. However, in 2004, Franklin acquired a pump manufacturer and decided to begin selling its motors and pumps directly to distributors. As a result, Pentair filed a lawsuit for breach of the sales agreement and related claims. The lawsuit quickly resolved when the parties entered into a Settlement Agreement. The Settlement Agreement governed Franklin's sale of both small and large motors (Units and Non-Units) to Pentair. In this case, Pentair claims Franklin breached the Settlement Agreement by overcharging Pentair for the purchase of large motors, Non-Units. Pentair also claims that Franklin tortiously interfered with its relationship with its largest distributor, Preferred Pump and Equipment, LP ("Preferred"), by using its monopoly power in the motor market to coerce Preferred into breaching its contractual obligations to Pentair. The district court granted Franklin summary judgment on Pentair's claims.

## II. Factual Background

On August 27, 2004, Franklin issued a press release announcing it had acquired JBD, Inc., which produced a pump line competitive with Pentair's line. In the same press release, Franklin announced its intention to sell motors directly to distributors. While the press release indicates the company planned to begin selling directly to distributors in November of 2004, Franklin's Senior

2

Vice President and President of the Americas Water Systems Group Robert Stone testified that Franklin actually started selling products directly to the distributors in "September or October, at the latest." Pentair believed the Franklin motors would be sold directly to Pentair's customers by Franklin for lower prices. As a result, it filed suit.

On September 30, 2004, Pentair filed a complaint against Franklin asserting claims for breach of the 2001 sales agreement, antitrust violations, unfair competition, and tortious interference with contracts/business relations. On October 1, 2004, the court entered a temporary restraining order ("TRO"). The TRO enjoined Franklin from selling the small motors, the Units, directly to Pentair's customers. The TRO also enjoined Franklin from increasing its pricing without complying with the sales agreement's notice requirement and from implementing certain new pricing.

On October 30, 2004, the parties resolved the litigation by entering into the Settlement Agreement. The Settlement Agreement amends the 2001 sales agreement and is effective October 30, 2004 through December 31, 2006. The Settlement Agreement addresses sales of both Units and Non-Units.

Sections 4(A) and 4(M) of the Settlement Agreement, among others, govern the sale of Units. Section 4(A) provides that "Franklin shall not sell any Units within the United States of America ('USA') and Canada to any customers except original equipment manufacturers ('OEMs') and 'Class A' Franklin Authorized Service Shops ('FAMS')" through December 31, 2006.

Section 4(M) provides favored pricing to Pentair on Units:

> With respect to all Units purchased in the USA and Canada by Pentair from Franklin from the effective date of this Agreement through December 31, 2006, Franklin agrees to provide most favored purchaser protection to Pentair such that the Unit prices (including rebates, discounts, allowances, promotions, subsidies or other credits or payments), warranties, benefits and other terms provided to Pentair are

equivalent to or better than the terms offered by Franklin to any of its other OEM and FAM customers in the USA and Canada . . . If Franklin enters into an agreement with or sells Units to any other OEM or FAM customer in the USA or Canada providing such customer with more favorable terms, then this Agreement shall be deemed appropriately amended to provide such terms to Pentair.

In addition, § 4(K) expressly excludes § 4(M), and consequently the sale of Units, from its provision which eliminates "all other previously announced allowances, discounts and programs for Franklin products" as of October 17, 2004.

Sections 4(C) and 4(N) of the Settlement Agreement govern the sale of Non-Units. Section 4(C) provides that Franklin is free to "sell [Non-Units] to any customers of its choosing, without limitation, including any distributors, notwithstanding Franklin's prior sales policies and practices, and whether or not Franklin sold to said customers or distributors previously." Section 4(N) provides:

> Except with respect to the Maximum Aggregate Payment described in subparagraph 4(G), the [earned volume discount] described in subparagraph 4(H) and as otherwise stated expressly in this Agreement, nothing herein shall prevent Franklin from making future adjustments to the price (whether by surcharges, discounts, rebates, allowances, or otherwise) of any of its products (including Units) as necessary or appropriate to respond to material, labor, and other business costs as may arise from time to time and upon sixty (60) days advance notice to Pentair. **Until December 31, 2006, Franklin agrees not to raise the price it charges to Pentair on High HP 4" Motors, 6-inch motors, and 8-inch motors, as well as on control boxes, drives, and accessories, by more than the price increase on any such products it charges to other customers, including Franklin Pump Systems, Inc. and any other current or future affiliate of Franklin's through December 31, 2006.**

(Emphasis added). Section 4(K) does not expressly exclude § 4(N) from its provision which eliminates "all other previously announced allowances, discounts and programs for Franklin products" as of October 17, 2004.

4

Franklin began selling Non-Units directly to distributors before execution of the Settlement Agreement. In addition, Franklin has offered and provided various discounts on Non-Unit sales to distributors that were not made available to pump OEMs. Senior Vice President and President of Americas Water Systems Group of Franklin, Robert J. Stone, explains:

> [F]or nearly a month prior to, and as of, the date of the Settlement Agreement, Franklin had been offering and providing various discounts and rebates on its Non-Unit products to distributors, but not Pump OEMs or Plaintiffs. As a consequence, prior to October 30, 2004, distributors' net costs for purchases of Non-Units, after factoring in discounts, rebates, and credits, were lower than Plaintiffs' and other Pump OEMs' net costs for those Non-Units.

Subsequently, Franklin increased its prices on Non-Unit products for all customers on one occasion in 2005 and on two occasions in 2006.

On February 5, 2005, Pentair's Vice President, Sales and Distribution, Kevin Hancock, became aware of the distributor incentives. On that day, he received a fax from Pentair's National Sales Manager, Dave Harris, with a copy of Franklin's 2005 letter to distributors detailing its distributor incentives. Pentair President William Waltz attested that he was "suspicious" that Franklin may have been violating § 4(N) of the Settlement Agreement but did not have "proof" until March 2009, when he received a copy of Franklin's programs from a distributor, Mitchell Lewis & Staver. However, on August 29, 2006, he received an email indicating that Franklin was providing incentives to distributors. The email states that, in addition to the .388 multiplier, "Franklin also provides a rebate to distributors of 10%-12% on the 6-8" motors."

Pentair asserts that Franklin had a virtual monopoly in the submersible motor market and used this power to "improperly manipulate the marketplace." In March 2005, Franklin approached distributors with the Turns & Earns Program. The Turns & Earns Program requires that a distributor

5

commit to buy 95% of its large motors directly from Franklin. In July 2005, Preferred signed up for the program. Franklin also publicly announced that it planned to stop selling its motors to OEMs, like Pentair, after expiration of the Settlement Agreement. In June 2007, Franklin terminated its relationship with a number of distributors. Pentair argues that the combination of these acts coerced Preferred into breaching the "best efforts" provision of the Distributor Agreement in place between Pentair and Preferred. Section 2.1 of the Distributor Agreement provides:

> Sales Promotion. Distributor [Preferred] agrees that it will use its best efforts to maximize sales of the Products and to develop and expand the market of STA-RITE INDUSTRIES'S [Pentair's] Products.

The Distributor Agreement was a one-year agreement effective January 1, 2005, that would be automatically renewed unless either party gave sixty days notice that it was not renewing the agreement. The agreement automatically renewed in 2006 and 2007. On October 25, 2007, Pentair exercised the non-renewal provisions of the Distributor Agreement.

On July 31, 2009, Pentair filed a complaint alleging breach of contract (count I) and tortious interference with contract (count II). In count I, Pentair alleges Franklin breached § 4(N) of the Settlement Agreement by failing to give Pentair price protection on its purchases of Non-Units from Franklin. In count II, Pentair alleges Franklin tortiously interfered with the Distributor Agreement by using its monopoly power to coerce Preferred to breach its "best efforts" obligation to Pentair.

On September 30, 2011, the district court granted summary judgment to Franklin on Pentair's claims because: (1) Pentair failed to provide notice of its breach of contract claim as required by Uniform Commercial Code (UCC) § 2-607(3)(a); (2) § 4(N) of the Settlement Agreement did not provide Pentair with a pricing advantage on its purchases of Non-Units from Franklin; and (3) the tortious interference claim was time-barred. In this appeal, Pentair argues that the district court erred

6

by: (1) improperly applying UCC § 2-607(3)(a) to the breach of contract claim; (2) failing to recognize a genuine issue of material fact as to when Pentair was on notice of Franklin's breach; (3) failing to interpret the disputed terms in the context of the entire settlement agreement as well as the parties' course of performance and industry usage; and (4) failing to apply the continuing tort doctrine to Pentair's tortious interference with contract claim.

## III. Standard of Review

This court reviews a district court's summary judgment decision de novo. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule of Civ. Proc. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In opposing a properly supported motion for summary judgment, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Id.* at 248, 251.

## IV. Analysis

**Breach of Contract Claim**

### 1. Failure to Provide Notice of Breach

The district court found that Pentair's breach of contract claim was barred by its failure to give timely notice of a claimed breach. Section 26-1-2-607(3)(a) of the Indiana Code, which adopts

7

UCC § 2-607(3)(a), states "[w]here a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy."[1] In *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, No. 1:08-CV-243, 2011 U.S. Dist LEXIS 34209, at *27 (N.D. Ind. Mar. 30, 2011), the court explained:

> The buyer must give notice in all cases in which it has accepted a tender of non-conforming goods, and such non-conformity 'includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract.' Ind. Code § 26-1-2-714 cmt. 2. 'The language of [UCC § 2-607(3)(a)] refers to 'any breach' without differentiating warranty and contract claims.'

Relying on this case, the district court found the timely notice provision applied to Pentair's breach of contract claim.

In order to comply with § 2-607(3)(a), a buyer must provide reasonable notice to the seller before filing a lawsuit. *See Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011) (applying Indiana UCC). Since "section 2-607 operates as a condition precedent to any recovery, the burden of proof is on the plaintiff to show that notice was given within a reasonable time." *Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978). In *Standard Alliance*, the plaintiff failed to provide notice that defendant was in breach of its warranty before filing suit eleven months later. *Id.* at 825. The court found that the claim was barred, reversed the jury award for the buyer, and noted that "underlying standards of commercial good faith, codified in UCC § 2-607, mandate this result." *Id.* at 828; *see also Courtesy Enters, Inc. v. Richards Labs*, 457 N.E.2d 572, 577-79 (Ind. Ct. App. 1983) (affirming district court's judgment in favor of seller

---

[1]The Sales Agreement contains an Indiana choice of law provision, and the parties appear to agree that the Indiana UCC governs the contract dispute.

8

on breach of warranty claim because buyer failed to give notice until at least eleven months after discovering problem, when it filed a counterclaim).

"The underpinning of UCC § 2-607 is a requirement of commercial good faith which is met by a prompt notice that the buyer is claiming a breach has occurred." *K & M Joint Venture v. Smith Intern., Inc.*, 669 F.2d 1106, 1114 (6th Cir. 1982). The notice provisions serve two important policies:

> First, express notice opens the way for settlement through negotiation between the parties. Second, proper notice minimizes the possibility of prejudice to the seller by giving him 'ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties.'

*Standard Alliance*, 587 F.2d at 826 (quotations and citations omitted).

Here, the district court found that the timely notice provision applies to Pentair's breach of contract claim and that Pentair failed to give timely notice. The district court found that Kevin Hancock, Pentair's then-Vice President of Sales, and William Waltz, its President, acted as buyers and that the Non-Units and the Units are "goods" as defined in the UCC. On February 5, 2005, Pentair's National Sales Manager, Dave Harris, sent a fax to Hancock regarding Franklin's lower pricing programs for distributors. On August 29, 2006, Waltz received an email stating that "Franklin also provides a rebate to distributors of 10%-12% on the 6-8" motors." The district court found that the fax and email provided Hancock and Waltz with information that should have led to the discovery of Franklin's alleged breach of contract. Because Pentair did not give Franklin notice of the breach of contract claim until years later, when it filed suit on July 31, 2009, the district court found that Pentair failed to satisfy the timeliness requirement.

### a. Lost Sales

In this appeal, Pentair argues that the notice requirement does not apply to "a large portion of Pentair's claim for breach of contract." Pentair argues the breach of contract claim includes: (a) instances in which Pentair purchased Non-Units at higher prices; and (b) instances in which Pentair did not purchase Non-Units because Pentair was not able to compete with the distributors and therefore lost sales. Pentair does not object to the application of the notice requirement to the overcharges portion of its claim as it admits it accepted and paid for all Non-Units delivered by Franklin without reservation. However, as to the lost sales portion of the breach of contract claim, Pentair argues the notice required under the statute is inapplicable because no "tender" was accepted.

In support of its argument, Pentair cites cases finding that notice is not required under § 2-607 for nondelivery of ordered goods. *See Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 n.39 (5th Cir. 1976) ("Notice, however, is not required when the seller has failed to deliver the goods . . . Section 2-607, by its terms, does not apply where there has been no tender or acceptance of the goods."); *Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245, 254 (N.D. Ill. 1974) (noting that § 2-607 does not apply to "the nondelivery of tons of liquid product it was obligated to deliver"); *Atronic Intern. v. SAI Semispecialists of Am., Inc.*, No. 03-CV-4892, 2006 WL 2654827, at *9 (E.D.N.Y. Sept. 15, 2006) (finding § 2-607 notice provision inapplicable to breach of contract claim for failure to deliver goods required by contract). The differential treatment of nondelivery of ordered goods is justifiable because "where delivered goods are defective, the seller may need notice in order to remedy the defect, but in a case of nondelivery, the seller as well as the buyer knows of the breach and needs no further notice." *Chemetron Corp.*, 381 F. Supp. at 254.

Franklin argues Pentair's acceptance of the Non-Units ordered and delivered precludes its lost sales claim. While Pentair seeks a twofold remedy, there is only one alleged breach: the failure to provide Non-Units at preferential prices. Franklin argues that upon acceptance of "a tender" of Non-Units, Pentair was required to provide timely notice of any alleged pricing defect it regarded as a breach of contract. In making this argument, Franklin emphasizes the statute requires that once a tender is accepted, the buyer must provide notice or "be barred from *any remedy*." Franklin argues the purposes underlying § 2-607(3)(a), including the requirement of commercial good faith, support application of the notice requirement here. Franklin argues Pentair's failure to give notice prevented the parties from "perhaps resolv[ing] the matter through non-litigious means" and gave Franklin "no opportunity to respond" or to "minimize the alleged lost-profit damages now being sought."

While this court agrees that the policies underlying the notice provision would be served by applying the provision to Pentair's lost sales claim, the statutory language does not support such a conclusion. Because the Non-Units that were never ordered were also never "tendered," the language of § 2-607(3)(a) is not applicable. Thus, the notice requirement does not bar the portion of Pentair's breach of contract claim relating to lost sales.

### b. Timeliness

As to the remainder of the breach of contract claim, for alleged overcharges, Pentair argues that a genuine issue of fact exists regarding the timeliness of notice. Pentair argues the February 2005 fax to Hancock, Pentair's Vice President of Sales and Distribution showing Franklin's lower pricing programs for distributors should not be considered because Hancock did not have specific knowledge of the details of § 4(N) of the Settlement Agreement and therefore his knowledge cannot be imputed to Pentair. Pentair also argues that the 2006 email to Pentair President Waltz alerting

him of the discounts being provided to distributors should not be considered because it was never authenticated. However, Waltz authenticated the 2006 email at his deposition. Pentair raised the authentication issue before the district court. The district court relied on the email in its summary judgment decision. A district court's rulings on authentication are reviewed for abuse of discretion. *United States v. Hatfield*, 815 F.2d 1068, 1074 n.4 (6th Cir. 1987). We therefore agree with the district court that this information should have led to the discovery of Franklin's alleged breach of contract. Pentair's claim for alleged overcharges for goods tendered is therefore barred.

## 2. Interpretation of § 4(N)

"Interpretation of a written contract is a question of law for which summary judgment is particularly appropriate." *Tri-Central High Sch. v. Mason,* 738 N.E.2d 341, 344 (Ind. Ct. App. 2000). Clear and unambiguous contracts should be enforced as written. *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). "'[W]e must leave to the individual parties the right to make the terms of their agreements as they deem fit and proper, and, as long as those terms are clear and unambiguous and are not unlawful, we can only enforce them as agreed upon.'" *New Welton Homes v. Eckman*, 830 N.E.2d 32, 35 (Ind. 2005)(quoting *C.A. Enters., Inc. v. Emp'rs Commercial Union Ins. Co. of Am.*, 376 N.E.2d 534, 536 (Ind. Ct. App. 1978).

The 2004 lawsuit against Franklin involved breach of contract claims regarding the sale of Units. In resolving that litigation, the parties executed the Settlement Agreement at issue in this case. Section 4(M) of the Settlement Agreement committed Franklin, through December 31, 2006, "to provide most favored purchaser protection to Pentair such that the Unit prices (including rebates, discounts, allowances, promotions, subsidies or other credits or payments), warranties, benefits and other terms provided to Pentair are equivalent to or better than the terms offered by Franklin to any

12

of its other OEM and FAM customers . . ." The Settlement Agreement prohibited Franklin from selling Units directly to distributors for its two-year duration.

In contrast, Franklin was permitted to continue selling Non-Units "directly to any customers of its choosing, without limitation, including distributors . . ." In addition, the price protections for Non-Units varied greatly from the price protections for Units. Section 4(N) of the Settlement Agreement requires that Franklin not "raise the price it charges to Pentair on [Non-Units] by more than the price increase on any such products it charges to other customers . . ." As the district court found, the "plain and ordinary meaning of Paragraph 4(N), as written, pertains solely to price 'raises' and 'increases' on Non-Units sold to [Pentair]" and does not guarantee Pentair "receive[s] the best or lowest Non-Unit pricing." This court agrees that § 4(N) does not expressly promise a pricing advantage nor does it assure Pentair Non-Unit pricing 18.8% lower than the pricing Franklin offered its other customers, as Pentair claims.

Franklin has submitted evidence showing that, as of the effective date of the Settlement Agreement, it was providing various discounts on Non-Units to distributors that were not available to Pentair and other pump OEMs, resulting in lower net prices to distributors. Franklin argues that nothing in the Settlement Agreement obligated Franklin to discontinue or eliminate this distributor pricing advantage. Even Pentair's witnesses acknowledged that the language in § 4(N) simply prevents Franklin from increasing the net price for Pentair by a percentage greater than the percentage increases charged others, rather than giving Pentair a pricing advantage it did not already possess. If the parties intended to provide Pentair with more favorable Non-Unit pricing than distributors, they would have created a provision which expressly guaranteed favorable pricing, similar to § 4(M)'s guarantee for the Units.

13

Pentair argues that discounts and rebates on the Non-Units gave it a pricing advantage over distributors, that § 4(N) was meant to protect Pentair's "historical pricing advantage" over distributors, and that any increase to the net price to Pentair (inclusive of list price, discounts, and rebates) had to be equally increased to distributors. However, the discounts and rebates provided to Pentair were eliminated by October 17, 2004, two weeks before the effective date of the Settlement Agreement. As of October 30, 2004, Pentair's alleged "pricing advantage" on Non-Units was already eliminated.

In an attempt to create a preferential pricing provision it failed to negotiate, Pentair asserts a number of far-fetched arguments. For example, Pentair asserts § 4(N) "preserve[s] the pricing advantage Pentair possessed over distributors *prior to the dispute* that resulted in the Settlement Agreement," rather than preserving the proportional pricing between Pentair and others *as of the effective date of the Settlement Agreement.* Along this same line of reasoning, Pentair tries to push back the effective date of the Settlement Agreement. Pentair argues that the pricing changes, as specified in particular provisions of the contract, became effective October 18, 2004, and therefore October 18, 2004 should be deemed the effective date of the contract. However, § 4(N) does not provide that it becomes effective on October 18, 2004. Instead, it is presumably effective on the effective date of the contract itself. Section 14 of the Settlement Agreement expressly provides that the effective date of the Settlement is the date the last counterpart is signed, which occurred October 30, 2004.

Pentair argues that "there are material factual disputes regarding whether Pentair or the distributors had preferential pricing on the effective date of the Settlement Agreement." Pentair cites the October 1, 2004 Temporary Restraining Order ("TRO") enjoining Franklin from "implementing

14

its new pricing, including the modification or elimination of discount programs and credits as announced in Franklin Electric's August 13, 2004 letter." Pentair asserts that the parties "agreed to maintain the 'status quo' during the settlement discussions, and, therefore, Franklin could not have made any sales with preferential pricing to the distributors." However, the testimony cited by Pentair in support of this statement merely states that the injunction prevented Franklin from selling *the 4-inch small motors, the Units,* directly to distributors. It does not appear that the TRO prohibited Franklin from selling the Non-Units directly to distributors.

Moreover, Pentair fails to contradict Stone's declaration, relied upon by the district court, which states that the distributors' net costs for purchases of Non-Units were lower than Pentair's net costs for purchases of Non-Units prior to October 30, 2004. Indeed, in support of its representation that "starting in 2005" the distributors received significant discounts and rebates, Pentair cites deposition testimony in which Franklin's employee acknowledges that the distributors "*continue[d]* to receive" discounts in 2005 and that distributors received a start-up rebate "starting sometime in *October 2004.*" (Emphasis added.) In the cited deposition testimony, Franklin's employee was asked about a document titled "Distributor Pricing Programs" which lists the distributor programs and has an effective date of October 4, 2004. Franklin has provided evidence showing that the distributors were provided discounted pricing prior to October 30, 2004, and Pentair has failed to come forward with specific facts showing that there is a genuine issue for trial. In short, Pentair's contract claim would require the court to disregard the clear language of the contract and supplant it with terms to which the parties never agreed. Thus, the district court properly found Franklin was entitled to summary judgment on Pentair's breach of contract claim.

15

**Tortious Interference Claim**

In count II, Pentair alleges Franklin tortiously interfered with Pentair's Distributor Agreement with Preferred "through the improper exercise of market power in an anti-competitive manner" and coerced Preferred to breach its "best efforts" contractual obligation to Pentair. The district court noted that Pentair does not contest that the two-year statute of limitations contained in the previous version of Wisconsin Statutes § 893.57 applies to its claim[2] and agrees that the claim was discovered more than two years before the complaint was filed on July 31, 2009. Pentair asked the district court, and now asks this court, to apply the "continuing tort" doctrine to delay the accrual of the limitations period. The district court addressed the "continuing tort" exception, finding that "Plaintiffs have failed to establish a genuine issue of material fact indicating that Franklin's alleged interference with its business relationship with Preferred Pump and Equipment constitutes a continuing violation rather than discrete, isolated acts." The district court applied the discovery rule and found that Pentair's tortious interference claim is time-barred.

Under Wisconsin law, "tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578, 583 (Wis. 1983). Claims "brought under § 893.57 accrue with the first discovery,

---

[2]Under Ohio's borrowing statute, Ohio courts apply Ohio law to make an initial determination regarding where the cause of action accrued and then apply that state's law to determine if the claim is time-barred. *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 242 (6th Cir. 2009). Under Ohio law, Pentair's tortious interference claim accrued in Wisconsin where Pentair is based and where the injury took place. *See In re Commercial Money Ctr., Inc.*, 603 F. Supp. 2d 1095, 1107 (N.D. Ohio 2009). Wisconsin law therefore applies to the statute of limitations issue. Before February 26, 2010, which is when the injuries alleged here occurred, the limitations period was two years. *See* 2009 Wis. Act 120 (expanding the limitations period within which an intentional tort claim can be commenced under § 893.57 from two years to three years effective February 26, 2010).

16

not when the injury ends or when the last known injury occurs." *Ward Mgmt. Co. v. Westport Ins. Corp.*, 598 F. Supp. 2d 923, 928 (W.D. Wis. 2009). In *McFarland v. Northwestern Mut. Life Ins. Co.*, 588 N.W.2d 927, 1998 WL 765503, at *5 (Wis. Ct. App. 1998)(unpublished table decision), the Wisconsin Court of Appeals rejected the plaintiff's claim that his intentional tort claim had not yet accrued because defendant's bad faith conduct continued. The court found a genuine issue of material fact on the limitations issue "arises only when it is unclear as to when the plaintiff knew or should have discovered his or her injury." *Id.* at *4. In that case, the court found the injury occurred when the defendant denied the plaintiff's claim and that the defendant's later actions were merely confirmations of the original denial. *Id.* at *5. The court found the claim time-barred by § 893.57 as "the record clearly establishes that [Plaintiff] was aware of his injury and a potential bad faith claim more than two years prior to the filing of [the] action." *Id.; see also Ward Mgmt. Co.*, 598 F. Supp.2d at 928 ("Plaintiff cites no case law to support its theory that a bad faith claim does not accrue so long as it is 'actively continu[ing].'") Based on these cases, Franklin argues an intentional tort cause of action accrues upon first discovery of injury, notwithstanding assertions of a "continuing tort."

Pentair argues the continuing tort doctrine is an equitable exception to the general discovery rule. *See Meadows v. Union Carbide Corp.*, 710 F. Supp. 1163, 1166 (N.D. Ill. 1989) (applying continuing tort doctrine rather than discovery rule). It cites *Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir. 2010) for the proposition that Wisconsin courts have adopted the continuing tort doctrine, and recognize that where the tort is continuing, the right of action is continuing as well. However, in *Kovacs*, the Seventh Circuit was not applying Wisconsin law, and Pentair has failed to

17

cite any Wisconsin cases applying the continuing tort doctrine to extend the limitations period. Moreover, even if the continuing tort doctrine was available, it does not apply here.

In *Kovacs*, the court explained that the continuing violation doctrine allows a plaintiff to obtain relief for time-barred actions by linking those actions with acts within the limitations period. *Id.* The court noted that the doctrine is about a cumulative violation rather than a continuing violation, explaining the doctrine "does not apply to 'a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing.'" *Id.* (quoting *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005). In *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003), the court explained that a "continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *See also Cole v. United States Sec'y of Labor*, 21 F.3d 430, 1994 WL 123903, at *2 (7th Cir. 1994) (unpublished table decision) (finding that a continuing tort is shown by continuing acts, not continuing effects of a single violation). Thus, to apply the continuing tort exception, there must be both a continuing course of misconduct and one of the defendant's allegedly tortious acts must fall within the limitations period. *Werner v. Pittway Corp.*, 90 F.Supp.2d 1018, 1033 (W.D. Wis. 2000); *Feltmeier*, 798 N.E.2d at 89 (finding action timely because the complaint included allegations of tortious behavior by defendant within the limitations period.)

While Pentair asserts that "no single incident can be identified as the cause of significant harm," Pentair's expert testified that 100% of Pentair's damages for the alleged tortious interference were caused by a single tortious act, specifically Franklin's low pricing on Non-Units to distributors in alleged breach of the Settlement Agreement that expired on December 31, 2006. Pentair identifies the following actions by Franklin in support of its "continuing tort" argument, all pre-July 2007:

18

- July 2004: Franklin met with four distributors and "informed the distributors that it was considering selling its motors directly to them."

- August 27, 2004: Franklin publicly announced that it planned to sell Franklin's motors directly to distributors.

- March 2005: Franklin offered distributors rebates on their purchases of Non-Units in 2005 under the Turns & Earns Program.

- December 9, 2005 and June 26, 2006: Franklin announced it would stop selling its motors to Pentair and the other OEMs after the Settlement Agreement expired on December 31, 2006.

- June 2007: Franklin terminated its relationship with certain distributors, but not Preferred.

Although Pentair argues Franklin's conduct continued throughout 2007, Pentair has failed to identify a single Franklin act after July 31, 2007. Pentair's attempt to bring these earlier actions within the limitations period by identifying one of its own later actions, termination of the Distributor Agreement, fails. Because all of Franklin's allegedly tortious acts were committed before July 31, 2007, Pentair's tortious interference claim is untimely even under the "continuing tort" doctrine.

**V.**

In conclusion, this court agrees with the district court in finding that the portion of Pentair's breach of contract claim seeking alleged overcharges is barred by the failure to provide timely notice as required by § 26-1-2-607(3)(a) of the Indiana Code. This court finds the notice requirement does not apply to the lost sales portion of Pentair's breach of contract claim. However, we agree that Franklin is entitled to summary judgment on Pentair's breach of contract claim because § 4(N) of the Settlement Agreement does not provide Pentair with a pricing advantage on Non-Units purchases. We also agree that Pentair's tortious interference claim is barred by the statute of limitations. For these reasons, the decision of the district court is AFFIRMED.

19